# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 11, 2015 Session

## STATE OF TENNESSEE v. LINDSEY BROOKE LOWE

**Appeal from the Criminal Court for Sumner County**
**No. 2011-CR-834     Dee David Gay, Judge**

_____

**No. M2014-00472-CCA-R3-CD – Filed July 12, 2016**

_____

The parents of the defendant, Lindsey Brooke Lowe, discovered the body of one of her newborn twins in a laundry basket in her bedroom. A second deceased newborn was also found in the basket, and the defendant gave an incriminating statement to police. A jury convicted the defendant of two counts of first degree (felony) murder, two counts of first degree (premeditated) murder, and two counts of aggravated child abuse, a Class A felony. The trial court merged the first degree murder convictions for each victim. The defendant received a life sentence for each first degree murder conviction and a twenty-five year sentence for each aggravated child abuse conviction, all to be served concurrently. On appeal she asserts that the evidence was insufficient to support the verdicts; that the trial court erred in not suppressing her statement; that the trial court was biased; that the trial court denied her the right to testify in her defense; that the burden of proof was shifted to the defense; that her motion for a change of venue should have been granted; that the physical evidence obtained through a search warrant should have been suppressed; that the trial court erred in excluding expert testimony regarding her ability to waive her right to remain silent; that the trial court erred in various other evidentiary decisions; and that she is entitled to relief under the theory of cumulative error. After a thorough review of the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

David L. Raybin (on appeal), Nashville, Tennessee; John Pellegrin (at trial and on appeal), Gallatin, Tennessee; and James Ramsey (at trial), Gallatin, Tennessee, for the Appellant, Lindsey Brooke Lowe.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Lawrence Ray Whitley, District Attorney General; and C. Ronald Blanton, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The defendant was interviewed by police and ultimately gave a statement in which she admitted placing her hand over each baby's mouth in order to stifle the child's cry. Prior to trial, the defendant moved to suppress her statement.

On November 5, 2012, the trial court held a hearing during which the State presented the testimony of Detective Steve Malach, who had obtained the defendant's statement. The defense focused primarily on showing that the *Miranda* warnings given by Detective Malach were not adequate. The defendant also tried to introduce the testimony of Dr. Pamela Auble, a forensic psychologist who had examined the defendant. The State objected to the testimony, and the trial court ultimately excluded it because Dr. Auble had not reviewed the interview between the defendant and Detective Malach. Defense counsel requested to make an offer of proof in question and answer form, but the trial court refused, concluding that the statements of defense counsel regarding the potential testimony, along with Dr. Auble's report, constituted a sufficient offer of proof. The defendant was permitted to call Dr. William D. Kenner to testify regarding the defendant's susceptibility to coercion. The trial court denied the motion to suppress, finding that the defendant was not in custody, that the *Miranda* warnings were adequate, and that her statements were knowing and voluntary. The defendant moved for an interlocutory appeal of the denial of the motion, which was likewise denied. In denying the interlocutory appeal, the trial court took exception to the defendant's summary of the proceedings on the motion to suppress. This court denied an application to review the denial of the motion to suppress. The trial court's comments at the hearing on the motion for interlocutory appeal then became the basis of a motion to recuse, which the trial court heard and denied on January 22, 2013. The denial of the motion to recuse was likewise appealed to this court, and this court affirmed the trial court's decision shortly before the trial began on March 11, 2013. *State v. Lindsey Brooke Lowe*, No. M2013-00447-CCA-10B-CD, 2013 WL 706318, at \*5 (Tenn. Crim. App. Feb. 26, 2013).

2

The defense also moved to suppress the physical evidence obtained from the defendant's home pursuant to a search warrant. Detective David Harrell testified at the hearing that he had prepared a search warrant and that he took it to Judge C.L. Rogers at 11:35 a.m. on September 14, 2011. The judge signed three copies in Detective Harrell's presence. One was returned to the judge, one left at the home, and one executed and put under seal. The copy under seal showed it was signed at 11:35 p.m., while the copies left in the home and kept in the possession of the judge both showed they were signed at 11:35 a.m. Detective Harrell testified he executed the warrant at 12:34 p.m. Judge Rogers testified that writing "p.m." on one warrant was a clerical error.

At the motion to suppress, the trial court found that Tennessee Rule of Criminal Procedure 41(d) was violated because the three copies of the warrant were not identical. However, the trial court concluded that the discrepancy was an unintentional clerical error, that the warrant was otherwise in compliance with constitutional principles, and that Tennessee Code Annotated section 40-6-108 (2010) acted to preserve the warrant. The trial court stated, "If there was ever a case for a good faith mistake or exception, this is the case," and the court denied the motion to suppress the fruits of the search warrant.

Prior to trial, the trial court also heard the defendant's motion for a change of venue. Defense counsel's legal assistant testified regarding certain internet searches she had performed that retrieved a wide variety of media coverage of the issue. Many of the comments to the news articles were vitriolic, vicious, and threatening. Rick Berry, an investigator hired by the defense, contacted persons from the county's jury panel lists from four months in early 2012. He discovered that seventy-seven percent of those who responded had heard about the deaths of the twins, and most of them had received their information from the media. Thirty-six percent of those who had heard about the deaths believed that the defendant was guilty of murder, and twenty-nine percent were closely connected to law enforcement. Of those that responded, forty-five percent felt it would be fairer for her to be tried outside the county. The trial court found that, although publicity around a trial was not a new phenomenon, "this social media, the threats, the hostility from these sites is something new." The trial court stated that it could, however, control the jury that actually sat to try the case, and it took the motion under advisement until after the panel had been subject to *voir dire* by the attorneys, noting that several of the factors in *State v. Hoover,* 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979) related to the actual jurors seated and the potential jurors called.

The record reflects that the defense and prosecution worked together to create a questionnaire to identify potential bias in the jury venire. In an attempt to ensure an impartial jury, the trial court arranged for summonses to be sent to approximately four hundred potential jurors and for the jury to be impaneled over a period of two days

instead of one. During an extensive *voir dire* process, the trial court excused sixteen jurors for cause. The State used four of its eight peremptory challenges, and the defendant used seven out of eight. At the end of *voir dire*, the trial court denied the motion for a change of venue, and the case proceeded to trial.

At trial, the State presented evidence tending to show that the defendant became pregnant after having sexual contact with a man who was not her fiancé, that she hid the pregnancy because of a fear of its social consequences, and that she suffocated her children to keep her family from discovering the births. The defendant presented evidence tending to show that she became pregnant after being sexually assaulted, that she did not, due to a preexisting mental defect, realize that she was pregnant at any time during the pregnancy, that giving birth unassisted affected the defendant's mental state and physical capabilities, and that the deaths of the children were not intentional or premeditated.

The defendant grew up in Hendersonville, Tennessee, and lived with her mother, father, and younger sister. The defendant's father and sister testified that she attended a private religious school and was involved in numerous activities such as swimming and dance. The defendant was close with her family and was always well-behaved and "meek." In 2005, while the defendant was away at college, the defendant's mother, who had previously run the home in addition to working, developed a benign brain tumor the size of an orange. After surgery, the defendant's mother underwent a change in her personality. She was no longer able to plan, clean, organize, or make financial decisions, and she experienced emotional highs and lows. The defendant tried to fill her mother's place by cleaning, getting groceries, and doing other domestic tasks when she came home from college on the weekends. The defendant had become engaged to Jonathan Brooks at college, but after she graduated in 2008, she moved into her parents' house to assist her mother. The defendant remained engaged to her fiancé, but the two lived in separate cities both before and after his graduation in 2009. The mother of the defendant's fiancé became ill, and the relationship between the defendant and her fiancé gradually became more distant.

Around April or May 2010, the defendant met Jeremy Smith through her cousin's husband. Mr. Smith began to send text messages to the defendant. The defendant's sister testified that she knew that Mr. Smith "had been bothering" the defendant but was not aware that the defendant at some point began communicating with him. Mr. Smith testified that he went on three dates with the defendant, had sex with her each time, and used protection only on the first two occasions. He tried to call her again after the third date, but she did not return his call. Mr. Smith testified that there were several twins in his family and that he himself was a twin. He acknowledged that he had told the defendant he wanted to marry her and wanted her to have his children before they ever

4

went on a date and while he had a girlfriend. He denied that the defendant had told him that she did not want to have sex or that he forced her to have sex with him. He acknowledged that he actually called her four times after their last meeting in early January 2011 but that she would not return his calls. He testified that he would have taken care of the babies and at first denied that he failed to pay child support for an existing child. However, he ultimately acknowledged that he had been charged with flagrant non-support of his daughter.

The defendant's text messages with Mr. Smith were introduced through Special Agent Reeves Garnett. In late November 2010, the defendant and Mr. Smith exchanged numerous flirtatious text messages. In one series of messages, the defendant asked Mr. Smith to join her at a restaurant and bar. When he responded that he was with his girlfriend, she asked him, "Y did u ask me to marry u if u were with her[?]" Mr. Smith responded, "Cuz i want to marry u. I want u to b the mother of my kids." The two exchanged messages apparently attempting to arrange a meeting around December 22, 2010.

The defendant became pregnant by Mr. Smith, and she was carrying twins. However, she did not tell anyone about her pregnancy. The defendant's father testified that he never knew or suspected that she was pregnant, despite the fact that it was not unusual for the family to go into the defendant's room. The defendant's sister likewise testified that she never knew or suspected that her sister was pregnant, even when she was carrying twins in her ninth month. She never heard anyone speculate that the defendant was pregnant.

In the spring of 2011, the defendant's fiancé's mother died. At around the same time, the defendant's mother suffered a return of her brain tumor, and the defendant tried to help around the house and drove her mother to radiation therapy. The defendant had been unable to find work in her field after graduating in 2008, so at some point in the summer of 2011, the defendant obtained work doing billing and insurance claims at a dental office. In August, she was transferred to a branch closer to her home. Terri Farrell, who worked with the defendant at the new location, testified that she never suspected the defendant was pregnant. All the workers at the dental office, even those in billing who did not have patient contact, wore scrubs with an optional lab jacket, and the defendant wore a black lab jacket every day. Michelle Stainback, the defendant's supervisor, also did not know or suspect the defendant was pregnant. She testified that no one at work knew about or suspected the pregnancy.

On the weekend of September 10, 2011, the weekend before the birth of the twins, the defendant was a bridesmaid in a friend's wedding in Kentucky. The defendant's sister, Lacey Lowe, testified that although the defendant had been fitted for her dress in

January or February, when she was only a month or two into the pregnancy, the dress still fit the defendant in her ninth month of pregnancy when she wore it to the September wedding. The defendant's sister and a friend named Lacey McFadden drove with the defendant from Hendersonville to Kentucky to attend the wedding. Although the young women in the wedding party were all changing in front of each other in the same room, no one noticed that the defendant was pregnant because she did not look different. The defendant's sister had noticed that the defendant had gained some weight, but her weight had always fluctuated, so she did not ascribe any significance to the weight gain. The defendant usually wore scrubs to her work and big t-shirts at home.

The defendant, her sister, and Ms. McFadden returned to Hendersonville on Sunday, September 11, 2011, and Ms. McFadden slept in the defendant's bed with her. The defendant went to work on Monday the 12th, exchanging a series of text messages with her sister about going to a concert, with her fiancé about a trip they planned to take together, and with Ms. McFadden. That evening, the defendant's family believed that the defendant had a stomach virus. The defendant stayed in the bathroom she shared with her sister, and the defendant's mother went to the door three times to check on her, accompanied by the defendant's father during one visit. The defendant told them that she was fine but sick. Because as a child she had always asked to be left alone when sick, her parents did not think this was unusual. The defendant's sister had stayed in her own room and was not aware that the defendant was ill until her parents told her. At around 10:39 p.m., the defendant's sister sent her a text message saying, "Let me know if u need anything…love you goodnight." At some point during the night, the defendant gave birth to twins in the bathroom.

On Tuesday, September 13, 2011, at 6:03 a.m., the defendant sent a text message to a coworker asking for the phone number of Ms. Stainback, her supervisor. The defendant then sent Ms. Stainback a text message identifying herself and saying she had been "up sick all night" and was still not well. She told Ms. Stainback that she could not come to work but would be at work the following day. Early in the morning after the births, the defendant's sister used their shared bathroom. She did not notice anything unusual about the bathroom. While the defendant's sister was in the bathroom, the defendant called her name and asked her for a glass of water. The defendant's sister made sure the defendant did not need anything else and then went to work. The defendant's father got ready to go to work himself and to take his wife, who could not drive because of her tumor, to work. He believed that the defendant had a stomach flu, and he did not see her before he left. The defendant was home alone all morning, with access to two vehicles. When the defendant's father returned home for lunch, the defendant was lying on a couch in an upstairs common area, and she seemed unwell but told him she was better. The defendant spent the afternoon at the house by herself, again

6

with access to two vehicles. The defendant's sister got her some Jell-O and crackers from the store on her way home from work.

During the day of September 13, 2011, the defendant sent several text messages. She sent her fiancé a text message around noon telling him she loved him. She sent some text messages to a friend, Rachel Hawkins, who was pregnant and due to deliver in early September. Ms. Hawkins told the defendant she would be induced the following week if the baby had not arrived. The defendant responded, "Awe I'm sorry! Well I've been thinking about you! Hopefully she will get here before Monday!" The defendant also discussed watching a television show called "The Vampire Diaries" with Ms. Hawkins if Ms. Hawkins' baby had not arrived by the time the show aired. In a series of text messages with her sister, the defendant discussed the upcoming concert they were attending. She also sent text messages to another friend regarding the concert and regarding her "stomach bug." The defendant stated that she "never went to bed last[ ] night I just laid in the bathroom floor." The defendant also told her fiancé that she had had a virus via text message that evening.

The next day, the defendant left for work in the billing department of the dental office. At 8:02 a.m., she sent her father a text message telling him that, in the billing accounts, she had just come across a man who shared a name with one of her father's relatives. She also sent a text message to her fiancé at 8:35 a.m. regarding information on the cabin they intended to rent for their trip. The defendant's father testified that the defendant's sister had left for work and that his wife was upstairs. The defendant's father heard his wife shout his name in a panicked voice. She told him that there was a newborn child in the defendant's room. The defendant's father looked at the child and spent about fifteen minutes unable to do anything due to shock. He then called a friend of his father's who is an attorney, and this man told him to call his pastor. He called his pastor, who started for the house but advised him to call the authorities. The defendant's parents did not go upstairs again.

Randy Tope testified that he was answering calls with the Hendersonville Police Department dispatch on September 14, 2011, when he received a telephone call, which was played for the jury, from the defendant's father at around 8:30 or 8:35 a.m. The defendant's father stated, "My daughter has gone to work, but apparently she has had a child in her room[,] and it is not living." Mr. Tope dispatched the police department, fire department, and emergency medical personnel.

Officer Jeremy Fentress was the first on the scene. He testified that the defendant's father told him that his twenty-five-year-old daughter had been sick and that his wife went to clean his daughter's room that morning. They had found a deceased newborn in a laundry basket by the bed. Officer Fentress checked on the infant, who was

7

under a sheet and bloody towel, and found him cold to the touch and not breathing. Barbara Jones, a paramedic, arrived on the scene and examined the infant, who was obviously deceased. She touched the infant's arm and found no rigor mortis. Ms. Jones testified that it would take twelve hours to reach full rigor and about twelve to come out again. She concluded that the baby had come out of rigor mortis. Ms. Jones testified that there was fecal matter on the towel but that the fecal matter could have drained out as the muscles relaxed after death. She testified that there was no meconium stain on the baby, which can be an indicator of fetal distress. The baby appeared to be full-term, and she estimated he weighed five pounds.

Law enforcement officers all testified that the defendant's mother and father were very cooperative. Detective Sergeant Jim Vaughn testified that he arrived on the scene shortly before 9:00 a.m. and assigned Detective Malach to interview the defendant. The defendant's father testified that he told Detective Malach where the defendant was and that he was concerned for her health because her blood type was Rh negative. He asked Detective Malach to take her to a hospital. He also asked Detective Malach if he could have an attorney present while police talked to the defendant, and Detective Malach replied that "she was too old."

Detective James Garrett was taking written statements from the defendant's parents while Detective Malach was interviewing the defendant at the police station. Detective Garrett testified that he received a communication from an officer at the station that there was a second baby in the home. Although the search warrant had not been obtained, Detectives Vaughn, Garrett, and Fentress went upstairs to check on the welfare of the second baby. Detective Garrett removed the sheet and towel from the basket and put them on the bed, intending to lay the first baby there. However, he discovered that the first baby's umbilical cord was attached to something in the basket, so Officer Fentress held the baby while Officer Garrett removed some items from the basket and discovered the second baby and placenta. The second baby had the umbilical cord lying across his neck and shoulder, but the cord was not wrapped around the baby's neck. After determining that the second child was deceased, they replaced the babies in the basket. Officer Fentress acknowledged that his report stated that the second baby was significantly smaller than the first and appeared to be only three or four pounds. Detective Garrett brought the basket out to an emergency vehicle backed up to the door, and he attached tags to the babies' ankles to distinguish them. The baby who had been discovered first was tagged "Baby Lowe 1" and the other was tagged "Baby Lowe 2." The officers all testified that the defendant's home did not contain any baby items or any supplies for taking care of a newborn.

Detective David Harrell prepared the search warrant for the defendant's home and executed it. Detective Harrell testified that he saw no blood in the bathroom. However,

8

testing indicated that there was blood or biological material on the bathroom floor, covering the toilet, and on a patch of carpet in the defendant's bedroom. In the closet of the defendant's bedroom, Detective Harrell found numerous blood towels and sheets, several pairs of bloody underwear and pajama pants, and a bloody shirt. He also found a Kendall Curity Maternity pads package for twelve pads in a trash bag in the defendant's room. In introducing photographs of the physical evidence found at the defendant's home, a picture of a shelf containing a series of books or videos of "The Vampire Diaries" was admitted over the defendant's objection. The trial court ruled that the photograph was "very relevant" to the issue of *mens rea*.

An autopsy was performed in an attempt to determine the manner of the twins' death. Dr. Brent Davis, a forensic pathologist, testified that the gestational age of "Baby Lowe No. 1" was forty weeks, that the baby weighed 6.5 pounds, and that he suffered from no abnormalities. The second baby had the same weight, gestational age, and absence of birth defects. Both babies had a subgaleal hemorrhage, which is a minor injury common in vaginal birth. Dr. Davis testified that if a baby were to die in utero or were born deceased, the lungs would not be aerated and would not float. The lungs of both babies floated and were aerated when examined under a microscope. Dr. Davis testified this meant that both children were born alive. The second baby had the umbilical cord around his neck. However, Dr. Davis testified that he examined the neck tissue and found no indentation or hemorrhage in the neck muscles, indicating that the baby was not strangled by the umbilical cord. Dr. Davis's report concluded that the babies were victims of homicide and that the manner of death was smothering.

Dr. Davis also, however, testified that "smothering comes down to a documentation to a lack of injuries." He elaborated that a conclusion that a baby was smothered was typically based on scene investigation and the absence of another obvious cause of death. He acknowledged that he relied heavily on the information given by law enforcement. He also testified that the placenta, if delivered on top of the babies in a toilet bowl, could suffocate one or both. He stated it was possible that one baby delivered on another could suffocate the first baby. Dr. Davis testified that newborns typically cannot regulate their body temperature well and that hypothermia could kill a newborn, particularly in water, in a matter of minutes to hours. He stated that hypothermia would also leave an absence of physical findings and that a baby who died of hypothermia would look the same as one who died of smothering. He also acknowledged that a mother who delivered without medical attention could lose consciousness, particularly if suffering blood loss, that she might not be able to tend the babies, and that they could die of exposure as a result.

Dr. Michael Baird testified that the twins were fraternal and that genetic testing indicated that Jeremy Smith was the biological father of both. The defendant's fiancé Brooks was excluded as the father.

The State introduced the testimony of Detective Malach and the defendant's video recorded statement as evidence that she had intentionally killed her newborns. The defendant introduced the testimony of Drs. William D. Kenner and Pamela Auble to establish that the defendant did not realize she was pregnant and that she suffered from mental defects and hypovolemic shock at the time of the births, rendering her incapable of forming the intent to commit the crimes.

Detective Malach testified that he was called to the defendant's home, and after he observed the first baby, he spoke with the defendant's father, who told him that the room belonged to the defendant and that, based on a text message he had received that morning, she was at work. Detective Malach left to interview the defendant at her workplace. He was driving an unmarked vehicle and wearing a suit.

At the dental office, Detective Malach told the defendant's supervisor that he would like to talk with the defendant privately. The defendant was at her desk, wearing headphones and smiling. She agreed to speak with him in private. Detective Malach identified himself as a police detective and asked if she knew why he was there. When she said she did not, he told her they had found the laundry basket. The defendant became serious at that point. He explained that he was trying to find out what had happened, and he asked for her cooperation. He told her that he would like to talk with her at the station and that he would read her rights when they got there. Detective Malach told her briefly what the rights were. She told him that she would like to go to the station with him. He relayed to the defendant his concerns that she might not be able to drive. He told the defendant that he would drive her, and she "wound up" coming with him. The defendant retrieved something from her vehicle before leaving the parking lot. She sat in the front seat, with no handcuffs, and Detective Malach never searched her. She had her purse with her, and they did not speak about the babies on the way. Instead, they had a casual conversation, which Detective Malach used to establish a rapport. At the station, the defendant sat on a bench in the hallway while Detective Malach prepared the room. No one was watching her. In the interview room, he read the defendant her rights, and she orally waived them.

During the interview, the defendant told Detective Malach that she knew she was pregnant "[p]robably almost the whole time," because she was not menstruating and was feeling different. She noticed she gained weight and began lactating shortly before the birth. She at first told Detective Malach that her fiancé was the father but later told Detective Malach that she "cheat[ed] on him" with Jeremy Smith "right before." She

10

stated that she had intercourse with Mr. Smith twice, once at the end of December and once in early January, and that Mr. Smith did not use protection. She had not told anyone she was pregnant because she was "just scared" of what her family would think, and she did not want her family or fiancé to be disappointed. She also did not want to risk losing her fiancé.

The defendant told Detective Malach that she was gone to the wedding from Thursday to Sunday. She stated that her stomach was hurting on Monday but she went to work. She did not eat dinner and began to have intense back pain about 6:30 p.m. She had a bowel movement around 9:30 or 10:00 p.m. Shortly after 10:00 p.m., she thought she was going to have a bowel movement and instead gave birth on the toilet. The defendant said that the baby landed in the toilet and that she lay down on the floor, shaking. During the interview, she stated that the baby cried for less than a minute, and she denied touching the baby. She did not see if the baby was submerged. At this point, the defendant told Detective Malach that there were two babies and that the second one was also in the laundry basket. Detective Malach left the room to get a tissue but also alerted another officer that law enforcement should check on the welfare of the second baby. The defendant initially stated that the second baby was born five minutes after the first one and never cried. She told Detective Malach that she got off the floor, delivered the second baby and placenta into the toilet bowl, and then lay back on the floor. She raised the possibility that the second baby might have bumped into the first one as it was born. The defendant stated that both babies were alive when they were born. She said she never looked at them and did not know what sex they were or if they were moving.

The defendant said she lay on the floor for about an hour and could not move. She told Detective Malach that her family came to the door two to three times after she had delivered the babies but she told them she was ill and did not need anything. She explained that around 3:00 or 4:00 a.m. Tuesday morning, she used a towel to retrieve the children and put them in the basket. She then cleaned up the bathroom and washed herself. She moved from the bathroom floor to the bedroom floor and finally got into bed. At 6:30, she heard her sister getting ready, and her sister asked how she was. The defendant told Detective Malach that she could not move and stayed in bed until noon, at which time she moved to the couch. She did not check on the babies, and she put the clothes she had worn into the closet. She moved to a different couch later in the day, and then she went to bed. The next day, she went to work. She stated that she had no plan for what to do with the deceased children. The defendant told Detective Malach that, although her mother sometimes did laundry for her, she did not think her parents would find the children.

Detective Malach then told the defendant that during the autopsy, the medical examiner would be able to tell if the babies were drowned, thrown against a wall, or if

11

"someone had their hand over their mouth." He urged her not to "ruin" the fact that she had been cooperative and to tell him if there was "more to this story." At this point, the defendant said that she did look at the sex of the baby and saw that he had a bowel movement. Detective Malach then assured her she was a good person who had made mistakes, told her that the autopsy would reveal what had happened, and told her that he sensed she felt guilty. The defendant then told Detective Malach:

> A. I guess it was more -- the first time was a little louder, so -- I mean, I don't think they're definitely not like drowning but maybe just kind of like -- I don't know. I don't want to call it smother. I was just trying to like keep them quiet.
> Q. How were you doing that?
> A. Just put my hand down there over the mouth.
> Q. Over the baby's mouth?
> A. (Nods head.)
> Q. How long would you say you did that for?
> A. Not very long.
> Q. Until it stopped crying?
> A. I -- I guess. I don't know.
> Q. I understand. I understand.
> A. Oh, my God.
> Q. I know. I know. It's okay. It's okay.

The defendant told Detective Malach that with the second baby "[i]t was just the same thing," and "I guess I just put my hand over the mouth." She stated that there was not as much crying with the second baby. Detective Malach then summarized the defendant's statement. She agreed that she put her hand over the first baby's mouth and that, when she did so, she knew he could not breathe. She agreed that she killed the baby. She then agreed that she put her hand over the second baby's mouth and that she knew that she killed him. The defendant agreed that they were "clearly alive" and that she "clearly killed them." Detective Malach testified that he attended the autopsy and told the medical examiner that the defendant had said she smothered her babies.

The defendant's version of events was introduced primarily through the testimony of her psychiatrist, Dr. Kenner. Dr. Kenner, who acted as the defendant's treating psychiatrist, testified that he had interviewed the defendant for over thirteen hours, had interviewed her parents, and reviewed her statement as well as medical records, text messages, and psychological reports. His testing revealed that the defendant appeared to be answering the psychological test questions honestly.

12

He testified that the defendant is a quiet, timid, passive person who froze and became numb in a challenging situation and who would rather have an interviewer fill in the blanks than present her own memories.  Dr. Kenner testified that from ages three to thirteen, the defendant suffered from bladder infections, spasms, and incontinence due to a urinary tract malformation requiring multiple surgeries during her childhood.  Dr. Kenner testified that she used dissociation to cope with the pain and embarrassment of this prolonged medical treatment.  When she was in a dissociative state, the defendant would feel as though events were happening to someone else.  Dr. Kenner testified that, during high school, the defendant would come out of class and have no memory of having attended and that this was indicative of dissociation.  He testified that, after the births, she mixed up appointments and arrived at incorrect times to her appointments with him.  He testified that this was also typical for dissociative patients.  Due to her medical history, the defendant would cope with stressful incidents by entering a dissociative state.

Dr. Kenner testified that the defendant's description of her two sexual encounters with Mr. Smith led him to conclude that she had been raped.  During the first encounter, she went to watch a movie at Mr. Smith's grandparents' home and discovered the television was in Mr. Smith's bedroom.  The defendant resisted Mr. Smith and told him she did not want to have sex with him.  Mr. Smith kept putting pressure on her thighs, causing her pain, and she eventually decided to "just get it over with" and asked him to wear a condom.  Dr. Kenner said that her dissociative disorder kept her from fighting and caused some amnesia around the event.  On cross-examination, he stated that in their second encounter, the defendant was at a friend's house and had been drinking.  Mr. Smith asked her if he could come.  Because she knew he did not have a license, she told him he could come, believing that he would have no way to get there.  She did not remember anything that happened after he arrived.

Dr. Kenner testified that the defendant suffered from pregnancy denial, which is sometimes associated with trauma such as rape.  He stated that pregnancy denial would have physical effects.  For instance, the fetus would be carried vertically so that the woman would not appear pregnant to others.  A woman suffering pregnancy denial might have lucid moments acknowledging the pregnancy, but would in general not know she was pregnant.  Dr. Kenner stated, "Probably 99.5 percent of the time she considered herself not pregnant. There were probably these, oh, shoot moments where, you know, something came through to her like, you know, I am pregnant. That's what typically happens with these women."  He testified it would not be uncommon for the woman, when she was confronted with the irrefutable evidence that she was pregnant after delivery, to say that she knew she was pregnant during the pregnancy.  At that time, the denial would be over.  The defendant never dreamt of babies or decorating while pregnant, which was a sign of pregnancy denial.  He also explained that she had clear liquid come from her breast prior to the birth and that she thought she had cancer.  Dr.

13

Kenner acknowledged that the defendant had stated that she knew she was pregnant to Detective Malach and Dr. Auble, but Dr. Kenner stated that this was a realization she had in retrospect and did not indicate that she did not suffer from pregnancy denial during the actual pregnancy.

Prior to trial, the defense had moved to exclude certain Google searches retrieved from the defendant's telephone. The prosecution stated that it did not intend to use the Google searches in its case-in-chief but that it intended to introduce them in rebuttal if the defendant's expert testified that she was not aware of her pregnancy. Accordingly, in cross-examination, the State attempted to cast doubt on Dr. Kenner's diagnosis of pregnancy denial by cross-examining him on certain Google searches performed on the defendant's cellular phone. The State asked Dr. Kenner if he was aware that the defendant's telephone was used for the following Google searches: "pregnancy calculator" on September 3, 2011; "pregnant and doctor porn" on September 5, 2011; "free videos of pregnant sex," "things to make you go into labor," and "pregnant women and doctor porn" on September 6, 2011; and "how to make yourself go into labor" on September 9, 2011. Dr. Kenner testified that persons suffering from dissociative disorder can split off segments of behavior and that the defendant might perform these searches and still generally be unaware of her pregnancy.

Dr. Kenner stated that the defendant believed she was dying at the time of the birth and did not know she was having a baby until she felt an ear. He also testified that the defendant did not try to smother the babies but that she told him she "pushed on the baby." She had stated that she did not feel the baby's mouth or any other body part but that the place she touched was "just kind of plain," indicating she was trying to comfort the baby by patting his back.

Dr. Kenner stated that he had diagnosed the defendant with post-traumatic stress disorder, chronic; dissociative order not otherwise specified; and major depressive disorder, chronic and severe. At the time of delivery, the defendant was also suffering from delirium brought on by hypovolemic shock due to blood loss. Dr. Kenner recounted the defendant's descriptions of feeling dizzy, lying on the floor, and beginning to black out as soon as she attempted to sit up after delivery. She recalled her head bouncing off the bathroom floor several times. Dr. Kenner testified that delirium would cause confusion such as that suffered by dementia patients. He testified that at the time of the births, the defendant was not able to form the requisite mental intent to commit the crimes and that she suffered from diminished capacity.

Dr. Kenner also noted that the defendant was still suffering from blood loss a few days after the birth. The nurse at the jail described her as suffering from pallor,

dehydration, and crusty lips. She also described feeling dizzy and coming close to losing consciousness in her conversations from jail with family members.

The defense sought to have Dr. Kenner testify regarding the reliability of the defendant's statement to police. During an offer of proof, Dr. Kenner testified that he had professional knowledge of interrogation techniques and false confessions. He described the defendant as the "low hanging fruit of coercive interrogation." He noted that she said "I guess" in front of many of her answers and that her statement was inaccurate. However, he also testified that he could not say whether her statement was true but that her statement was "so contaminated by Detective Malach's narrative that we don't know if it is true or not." The trial court decided not to permit testimony on the reliability of the statement because it found Dr. Kenner's testimony was not credible and would not substantially assist the jury. The trial court also excluded Dr. Kenner's report regarding the voluntariness of the statement.

Dr. Pamela Auble, a forensic psychologist, evaluated the defendant ten days after the births. Dr. Auble testified that the defendant was passive and introverted and that she coped with stress by withdrawing. Dr. Auble also concluded that the defendant used dissociation to distance herself from unpleasant events. The defendant did not think logically, and she reacted emotionally. The defendant told Dr. Auble that she knew she was pregnant but dealt with it by forgetting about it or telling herself she was sick. The defendant said, "[I]t runs through my mind a thousand times a day, why didn't you ask for help, but I just wanted to die." The defendant told Dr. Auble that, after the first baby was born, "my mind just shut off all feeling and everything. It all went away. I don't know. I just wanted it over." She said that she did not look at the baby, but she stopped the baby from crying by putting her hand on him. She lost consciousness. She pretended it was not happening, and more than that, that "it wasn't happening to … me." The defendant remembered very little of the second birth. She thought she was dying because she was losing blood, shaking, and because whenever she attempted to get up, blood would gush and she would start to black out. She told Dr. Auble that she also stopped the second baby from crying. Dr. Auble testified that she relied on Dr. Kenner's diagnosis that the defendant was suffering from delirium. She also diagnosed the defendant with depressive disorder, chronic; dissociative disorder; and post-traumatic stress disorder. She stated that the defendant was unable to form the intent for first-degree murder. Dr. Auble acknowledged that the defendant told her that her biggest mistake had been being unfaithful to her fiancé. She acknowledged that the defendant was able to clean up herself and the bathroom, move the babies, and notify her work after the births.

In rebuttal, the State introduced the testimony of Dr. John Hutson, a forensic psychologist. Dr. Hutson agreed that the defendant suffered from a severe form of major depression and from post-traumatic stress disorder. He did not find that she suffered

from dissociative disorder, but he concluded that the finding would not make much difference because, even if she had been suffering from dissociative disorder, she would not have lost her cognitive abilities but would simply have felt that she was not a part of the events around her. He concluded that she did not suffer from dissociation because she did not have a history of getting lost driving or an inability to be on time and because the defendant's home was neat in the downstairs and common areas and very messy in the bedrooms and private areas, indicating that the person taking care of the home was making rational decisions about where to clean. He also rejected the idea that she was dissociative based on the fact that she was able to turn her family away when they offered help and because she was able to thoroughly clean up the evidence of the births. He also suggested that if she had been in pregnancy denial, she would have sought help when the birth began because she would have believed it was an illness. Dr. Hutson testified he felt the defendant had the mental capacity to commit the crimes with which she was charged. Dr. Hutson testified he was very concerned that the defendant might be suicidal when he saw her in 2012. He agreed that she might have memory loss from the event and that dissociation could occur as a defense during trauma. He also agreed that extreme blood loss could cause loss of consciousness and hallucinations.

During the trial, the record indicates that the defendant became emotional numerous times. After the testimony of the first witness, Mr. Tope, the trial court had the jury take a break and asked defense counsel, "Is she okay? And can she do a little bit better on crying? It's a double-edged sword here." Defense counsel indicated that they would like a break to allow the defendant to calm down, and the judge responded that they should let him know whenever they needed a break. During the testimony of Agent Reeves, the court again took a break to accommodate the defendant's emotional response. Defense counsel noted that the defendant was receiving mental health treatment and had been avoiding looking at some of the evidence. The trial court noted, "My bottom line here is I want to be sure that she's in a position to assist you." After the testimony of Mr. Smith and out of the jury's presence, the trial court spoke to defense counsel: "I'm concerned about your client. She is acting like a child. She has her head down, her ears covered, and I'm not going to tolerate that. Is she on medication? Is she okay?" In chambers, the trial judge elaborated on the conduct:

> Now, I know this is an emotional trial, and we had a problem yesterday and it was handled. But today, during the testimony of Jeremy Smith, I looked over at her many times and she just looked like a child that wasn't getting her way. She had her head down, covered her ears, like she didn't want to listen. I couldn't tell if she was awake or asleep.

16

… I can't have her emotions being on display in front of the jury. Their job is difficult enough. And I'm going to tell you and I'm going to tell her that if it happens again she's going out of that courtroom. I'm going to warn her.

The trial court stated that it did not want the defendant's behavior to influence the jury. Defense counsel noted that the previous day, the defendant had been writing Bible verses over and over on the advice of a psychologist, and the court stated, "It was unbelievable what she was doing. She was just over there wham, wham, just not paying attention to anything, just in her own world." The trial court stated to counsel that the defendant would have to "endure the trial and not show any emotions," noting that the court could take a recess whenever the defendant needed one. The court concluded that "I'll be sensitive to it. I know it's emotional, but I just can't have this." The parties then returned to the courtroom where the defendant was present, and the trial judge admonished the defendant:

Now, two times in two days I've had to bring to the attention of the defense the emotions of the defendant that are being displayed to this jury. This emotion was displayed yesterday, and I dealt with the problem yesterday, and it was handled. But today during the testimony of Jeremy Smith the defendant looked like a child sitting over there with her head down, ears covered, like she didn't want to listen to the testimony. And I honestly couldn't tell if she was awake or asleep.

I've told the defense that I will not have her emotions be on display for this jury. Their job is difficult enough. This case is extremely emotional, and I know -- I'm trying to be sensitive to the emotions of the defendant.

So, Ms. Lowe, this is the way it's going to be. It's happened two times that your emotions have been on display in front of the jury. I have asked the defense to let me know. If you need a break, we'll take a break, but you sit there and you don't show any emotion to this jury. Like I said, their job is hard enough. We're doing the best that we can to keep all of the emotions out of this case, away from the jury, so that they can decide this case on the evidence and the law.

17

I will not have you sitting there acting like a child or displaying emotion uncontrolled. The next time that this happens, you will be excluded from this courtroom. I have set up the way that things are going to be handled from this point on. They will be handled that way. We will watch your emotions. But I'm not going to deal with this anymore in the way that we've had to. Do I make myself clear?

During the in-chambers conference after the testimony of Mr. Smith, defense counsel also stated to the court:

Judge, you know, we're dealing with a young lady who has some pretty significant mental health issues. She's mentally ill. The problem it poses for us is I have spent a lot of time going over with her her testimony, and I don't think I'm going to be able to call her as a witness in her own defense simply because I don't think she can do it. I don't think she can emotionally get through it.

The defendant did not testify at trial. Prior to the defendant making the decision, defense counsel told the court that the defendant "dreads testifying" and that, although he had originally anticipated calling her, the defendant had come to the conclusion that she did not want to testify. During the *Momon* hearing, the defendant told the court that she had decided not to testify because "I just don't feel like I can emotionally handle it." She agreed that she had been crying moments before when they discussed the possibility.

Trial counsel moved for a mistrial on the basis of the trial court's comments to the defendant. The trial court denied the motion, noting that, although it was "sensitive to the mental health situation" of the defendant, it found that the defendant's action of putting her head down and covering her ears with her hands was "a known, intentional response and it was childlike."

The jury convicted the defendant as charged on all counts. The trial court held a sentencing hearing to determine the length of the sentences for aggravated child abuse. The defense submitted a scrapbook of the defendant's life and eighty-eight letters of support written by friends and family. The letters spoke of the defendant's past commitment to friends, family, and her church, and they detailed her giving and selfless nature. Dr. Auble testified that the defendant's offense was a "situational crime," that it was not part of a larger pattern of criminal activity, that the defendant was not likely to be repeat offender, was not a risk to the public, and was amenable to rehabilitation. The defense called eight character witnesses from among the defendant's friends and family,

18

who all testified that the defendant was mild-mannered, honest, and non-violent. The defendant stated that she could not explain why she had put her babies in the laundry basket or what was going through her mind, and she acknowledged her responsibility and was sorry. The trial court sentenced the defendant to a life sentence for each murder conviction and to twenty-five years for each aggravated child abuse conviction and imposed all of her sentences to run concurrently.

The defendant moved for a new trial on numerous grounds, and the trial court denied the motion. On appeal, the defendant asserts that: (1) the evidence was insufficient to uphold the verdict; (2) her statement to police was obtained in violation of her constitutional rights; (3) the exclusion of Dr. Auble's testimony at the hearing on the motion to suppress was a constitutional violation; (4) she was denied her right to an impartial judge; (5)the trial court's admonitions regarding her show of emotion effectively denied her the right to testify; (6) allowing the State to present rebuttal evidence shifted the burden of proof to the defense; (7) that her constitutional rights were violated by the denial of a change of venue; (8) the physical evidence from the search of her home should have been suppressed; (9) the exclusion of the testimony of Dr. Kenner regarding her statement to police was a denial of her right to due process; (10) certain text messages should not have been admitted because the times reflected on the devices may not have been accurate; (11) the trial court erred in allowing Dr. Kenner to be cross-examined regarding the internet searches made on the defendant's telephone involving pregnancy; (12) the jail calls made by the defendant were improperly excluded; (13) the photograph of the videotapes of "The Vampire Diaries" should have been excluded; and (14) the defendant is entitled to relief under a theory of cumulative error.

## ANALYSIS

### I. Sufficiency of the Evidence

The defense challenges the sufficiency of the evidence, asserting that the only proof of premeditation was the evidence that the defendant continued to plan for her own future after the deaths of her children. The defendant argues that communicating with friends regarding a concert, a television show, and a planned trip is insufficient evidence to establish the element of premeditation.

This court must set aside a finding of guilt if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013).

19

This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "This Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *Wagner*, 382 S.W.3d at 297.

The defendant was convicted of two counts of first degree premeditated murder, two counts of first degree felony murder, and two counts of aggravated child abuse. First degree premeditated murder is a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2010). A premeditated act is one done after the exercise of reflection and judgment, and the intent to kill must have been formed prior to the act. T.C.A. § 39-13-202(d). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* However, it must be determined, from an examination of the mental state of the accused, that the accused was sufficiently free from excitement and passion as to be capable of premeditation. *Id.*

Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence that could lead a rational trier of fact to infer that the accused committed the killing after the exercise of reflection and judgment. *Id.* at 615. Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013).

Factors that tend to support the existence of premeditation include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing

20

or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id.* Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)).

A killing of another committed in the perpetration of aggravated child abuse is also classified as first degree murder. T.C.A. § 39-13-202(a)(2). First degree murder committed in the perpetration of aggravated child abuse requires no culpable mental state except the intent to commit the underlying felony. T.C.A. § 39-13-202(b). Aggravated child abuse is committed when a person knowingly, other than by accidental means, treats a child in such a manner as to inflict injury, and the treatment results in serious bodily injury to the child. T.C.A. §§ 39-15-401(a), -402(a)(1).

The defense presented evidence that tended to show that the defendant was not aware of her pregnancy and was shocked by the births, that she was physically incapacitated and lost consciousness as a result of blood loss, that she suffered from diminished mental capacity, and that the physical evidence was consistent with the babies dying from hypothermia while she was unconscious or with the babies being suffocated by each other or the placenta while she lay unconscious on the floor. The defendant took no steps to dispose of the bodies of the babies, despite opportunity to do so.

However, on appeal we must view the evidence in the light most favorable to the State, and we conclude that a rational trier of fact could have found the elements of the crimes established beyond a reasonable doubt. The State presented evidence that the defendant had a close relationship with her religious, conservative family and that she was engaged to be married. She became pregnant and was afraid to reveal her pregnancy to her family and to her fiancé, who was not the father of the children. The defendant did not see a doctor about the pregnancy and made no preparations for the birth or care of a child. However, several internet searches performed on her telephone in September related to pregnancy. Furthermore, the packaging of some maternity pads was recovered from the trash can in her room. On the evening of the birth, the defendant told her family that she had a stomach virus. Her parents came to the bathroom door to check on her three times, but she never asked for assistance. She told Detective Malach that she placed her hand over each baby's mouth because she "was just trying to … keep them quiet." She stated that she put her hand over the first baby's mouth until he stopped crying. After having held her hand over the first baby's mouth, she told Detective Malach that she gave birth again and that she then did the same to the second baby. She agreed that she knew that the baby could not breathe with her hand over his mouth, and she agreed that she knew she had killed the second baby. A rational trier of fact could have found that the defendant formed the intent to kill prior to the act and after the

21

exercise of reflection and judgment. T.C.A. § 39-13-202(d). The jury could have inferred that she had a motive to kill the children in order to continue hiding the fact that she had become pregnant, that she made preparations to hide the births by procuring maternity pads, that she hid evidence of the crime by cleaning the bathroom and hiding the laundry basket, and that she demonstrated calmness after the crimes when she was able to refuse her family's offers of help. *See Adams*, 405 S.W.3d at 663; *Bland*, 958 S.W.2d at 660; *Larkin*, 443 S.W.3d at 815-16. A rational trier of fact could also have found that the defendant knowingly treated the children in such a manner as to inflict injury by placing her hand over the newborns' mouths, that the act resulted in serious bodily injury to the children, and that the defendant committed two killings in the perpetration of this aggravated child abuse. T.C.A. §§ 39-15-401(a), -402(a)(1); T.C.A. § 39-13-202(a)(2). The evidence was sufficient to support the jury's verdicts.

## II. Suppression of Statement

The defendant alleges that her statement was obtained in violation of her rights because the trial court erred in finding that she was not in custody and because the *Miranda* warnings were invalidated by Detective Malach's accompanying statements. She also claims that the waiver was not made voluntarily due to her mental condition.

A trial court's factual findings made during a motion to suppress are binding on an appellate court unless the evidence preponderates against them. *State v. Saylor,* 117 S.W.3d 239, 244 (Tenn. 2003). Determinations of witness credibility and the resolution of conflicts in the evidence are left to the trial court. *State v. Riels*, 216 S.W.3d 737, 753 (Tenn. 2007). An appellate court may consider testimony presented at trial in reviewing the trial court's conclusions in a motion to suppress evidence. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and to all reasonable inferences drawn from the evidence. *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008). A trial court's conclusions of law are reviewed de novo. *State v. Sawyer*, 156 S.W.3d 531, 533 (Tenn. 2005). Likewise, a trial court's application of law to the facts is reviewed de novo. *Walton*, 41 S.W.3d at 81.

Detective Malach testified at the suppression hearing that he was called to investigate a death at the home where the defendant lived with her parents. He arrived at the house around 8:38 a.m. on September 14, 2011, and he observed a deceased newborn baby lying on his side inside a laundry basket in the defendant's room. The defendant's father informed police that he believed the defendant was at work based on a text message he had received from her. Detective Malach was assigned to go to the defendant's workplace and interview her. At around 9:00 a.m., Detective Malach arrived at the dental clinic where the defendant handled insurance and billing claims, and he

22

asked the manager if he could speak with the defendant privately. The defendant appeared to be in a good mood and was smiling and wearing headphones when he saw her. Detective Malach asked her if she knew why he was there, and she said she did not. When he informed her that police had discovered the laundry basket, the defendant's mood changed. He explained to her that he wanted her cooperation and would like her to go to the police department, where he would administer *Miranda* warnings. Detective Malach testified that he told the defendant what the *Miranda* warnings would entail, but he did not consider this a formal *Miranda* warning. Detective Malach testified he told the defendant she did not have to come or to talk to him if she did not want to, but she agreed to come to the station.

Detective Malach was aware that the birth had been recent, and although the defendant told Detective Malach that she was able to drive, Detective Malach "asked if she would mind" if he drove, offering to return her to her car later. He testified that she had driven herself to work and appeared healthy, but he wanted her to ride with him for her safety. The defendant agreed. The defendant rode in the front seat and was not handcuffed. The conversation during the approximately thirty-minute drive to Hendersonville did not touch on the deaths but was casual conversation related to the defendant's career.

At the station, Detective Malach took the defendant into an interview room. Detective Malach testified that the interview room had no windows, was in the interior of the building, was past several doors, and was not open to the public. Only law enforcement and civilian police staff were in the area. Detective Malach testified at the hearing that a locking door to the area had recently been installed, but he could not recall if there was a locked door to get to the area at the time he interviewed the defendant.

He explained to the defendant that if she needed a break, he would give her one, and he got her water to drink. He acknowledged that he did not have her sign the waiver of her rights, which he read to her. He also did not read the portion of the form that recited that the defendant's waiver was not the result of promises or threats and that the defendant chose not to have a lawyer. He acknowledged that he referred to the defendant losing a lot of blood toward the end of the interview and that he did not know if she had received any medical attention since giving birth.

The defense offered the testimony of Dr. Auble, which the trial court excluded because she had not reviewed the interview with police. After the exclusion of Dr. Auble's testimony, the defense offered the testimony of Dr. Kenner, who had reviewed the police interview. Dr. Kenner testified that he first saw the defendant on October 21, 2011, and that he had seen the defendant between eight and ten times. He diagnosed her with post-traumatic stress disorder, dissociative disorder, and adjustment disorder with

anxiety and depression. He testified that the defendant had suffered from repeated urinary tract infections, bladder spasms, and incontinence from the ages of three to thirteen and that she underwent multiple surgeries. Her medical history made her likely to retreat if confronted with powerful people. He stated that while she was capable of hearing and understanding rights cognitively, she was not capable from an emotional standpoint of maintaining her will in the face of a powerful male interrogator. He testified that she was passive and vulnerable to complying with the interrogator's version of reality. She was also suffering from postpartum physical symptoms, including hormonal swings, dehydration, insomnia, and pallor. He testified that, in the interview, Detective Malach created a narrative with which he asked her to agree. He noted that the detective's demeanor was friendly but that he suggested eleven times that she smashed, drowned, or suffocated her babies. Dr. Kenner also testified that the defendant was delirious at the time of the births and was not capable of knowing that her hand would suffocate a baby.

The trial court denied the motion to suppress, finding that the defendant was not in custody, that she was alerted to her rights, and that her statements were knowing and voluntary. The trial court found that the interrogation took place in the morning for about one and a half hours, after the defendant had driven herself to work. The defendant agreed to ride in the passenger's seat next to Detective Malach, who did not handcuff her. Only one officer, who was pleasant and polite, was present. The trial court found that, in the interview room, the defendant was seated between the detective and the closed door and that the two were about five feet apart. The defendant appeared to be deliberative and able to engage in a conversation, even about sensitive, private issues. She was given water, a tissue, and a break. The trial court also found that Detective Malach sufficiently clarified the defendant's reference to having an attorney, and it ruled that the statement would be admissible at trial.

The defense was permitted to revisit the suppression issue at a hearing on February 21, 2013. In particular, the defense was permitted to adduce proof on the issue of custody, which the defense claimed had not been contested by the State at the prior hearing and unexpectedly formed the basis of the trial court's decision to deny the motion to suppress.[1] At the second hearing on the motion to suppress, the defendant testified that on September 14, 2011, she arrived at work between 7:30 and 8:00 a.m., and that Detective Malach arrived at around 10:00 a.m. He was wearing a suit. She spoke with him for about ten minutes in a private room at her workplace. He asked her to go to the police station, and she asked if she could get her purse and then went with him. The

---

[1] We note that in defense counsel's argument at the hearing, counsel stated that the custody issue "did come up. We were not surprised." Counsel noted that the defense had prepared, but not filed, a supplemental brief on the issue.

defendant asked the detective if she could drive and he said, "I would rather you come with me." He did not, however, order her to get in the car. When she asked the detective what to do with her car, he told her to leave it and that they would be back shortly to get it. She confirmed that she sat in the front seat and was not handcuffed. She testified that the detective locked the doors when he got in the car. At that point, she felt she was not free to leave. She acknowledged, however, that she could have opened the car door from the inside. She was driven to a side building of the police station and went in a side door. She did not recall going through any doors other than the main entrance. The defendant sat on a bench in the hallway for about thirty minutes. She had her purse and cell phone with her. The defendant testified that no one was watching her and she could have walked out of the station, although it never crossed her mind to do so. She observed armed officers in the hallway. Because she was not sure if she could use her phone, she did not answer it when her grandmother called her while she was seated in the hallway. She then accompanied Detective Malach into an interview room immediately beside the bench where she had been seated. The defendant did not answer a text message in the interrogation room. She acknowledged that she was a twenty-five-year-old college graduate at the time. Detective Malach was not rude or overbearing. The trial court again denied the motion to suppress. The defendant asserts error, arguing that she was in custody, that the *Miranda* warnings were inadequate because they were accompanied by deceptive statements, and that her waiver was not voluntary.

## A. Custody

Both the United States Constitution and the Tennessee Constitution protect against compelled self-incrimination. U.S. Const. Amend. V ("No person … shall be compelled in any criminal case to be a witness against himself…."); Tenn. Const. art I, § 9 ("[I]n all criminal prosecutions, the accused …  shall not be compelled to give evidence against himself."). Exculpatory or inculpatory statements made during custodial interrogation may not be admitted  unless the prosecution demonstrates that police employed procedural safeguards by advising the defendant:

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Sawyer*, 156 S.W.3d at 534 (quoting *Miranda v. Arizona,* 384 U.S. 436, 444, 479 (1966)). These warnings are necessary when the accused is in custody and subject to interrogation or its functional equivalent. *R.D.S. v. State*, 245 S.W.3d 356, 363 (Tenn. 2008).

25

A person is in custody within the meaning of *Miranda* when there has been "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 854 (Tenn. 1996) (quoting *California v. Beheler,* 463 U.S. 1121, 1125 (1983)). The inquiry is ultimately "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Dailey*, 273 S.W.3d 94, 102 (Tenn. 2009) (quoting *State v. Anderson,* 937 S.W.2d at 855). This determination is made considering the totality of the circumstances and is not based on the subjective beliefs of the defendant or of law enforcement. *Anderson*, 937 S.W.2d at 854. Accordingly, the officer's suspicions regarding the accused are only relevant insofar as they were apparent to the accused and would have affected a reasonable person's evaluation of whether or not he or she was deprived of freedom of movement. *Id.* Other factors that bear on the analysis are:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* at 855.

Although the defendant arrived to the station in Detective Malach's car, her mode of transportation and the place of the interview are not, alone, determinative of the custody issue. *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (noting that the fact that questioning occurs at the police station does not, in itself, mandate *Miranda* warnings); David Louis Raybin, 10 *Tenn. Prac. Crim. Prac. & Procedure* § 19:19 ("Not all interrogation in a police vehicle or at a police station is 'custodial' within the meaning of *Miranda*."). In *State v. Bush*, the defendant initiated contact with the police, and he and his father were taken to the station in a patrol car. *State v. Bush*, 942 S.W.2d 489, 500 (Tenn. 1997). The defendant was not told that he could leave; however, neither was he restrained or treated in an accusatory manner. *Id.* The Tennessee Supreme Court

26

concluded that the defendant was not in custody. *Id.*; *see also State v. Darnell*, 905 S.W.2d 953, 959 (Tenn. Crim. App. 1995) (defendant was not in custody when he voluntarily rode with detective to the police station in the front seat of an unmarked car and was never handcuffed); *State v. Gosnell*, 62 S.W.3d 740, 745-46 (Tenn. Crim. App. 2001) (no custody where the defendant was taken to the station in an unmarked vehicle by plain clothes officers, was treated courteously, allowed to visit with relatives in a hallway, told she would be taken home, and not confronted with guilt).

An interview at the police station that is not confrontational and imposes little restraint on the movements of the accused may not be custodial given the totality of the circumstances. *Riels*, 216 S.W.3d at 754 (concluding the defendant was not in custody when he arrived with his mother, was not prevented from leaving the interview room, was left unattended for large amounts of time, and was treated cordially); *State v. Munn*, 56 S.W.3d 486, 499 (Tenn. 2001) (defendant was not in custody when he arrived to the police station with his parents, spoke with officers, sometimes with his parents present, for three and a half to four hours, was treated politely but accused of committing the crime, and was reminded that he was not under arrest and free to leave).

On the other hand, if the defendant is told that he or she will be charged with a crime or is prevented from leaving the station, the totality of the circumstances weigh in favor of finding custody. In *State v. Dailey*, the defendant was asked to come to the station under false pretenses and interviewed in a secured portion of the building by two officers, one of whom was armed; however, he was briefly left alone in the room and not restrained. *Dailey*, 273 S.W.3d at 102. Officers were seated between the defendant and the closed door, and a few minutes into the interview, one officer informed him that, based on already available evidence, he would have to charge the defendant with first degree murder. *Id.* at 103. The Tennessee Supreme Court concluded that the defendant was in custody "at least by the point at which" the detective informed him that police had evidence sufficient to charge him. *Id.* at 104; *see also State v. Payne*, 149 S.W.3d 20, 33-34 (Tenn. 2004) (concluding that the defendant, who drove himself to the station, was not restrained or patted down, was positioned so that his egress was not blocked, and was initially treated courteously, was nevertheless in custody "at the latest" when officers stood blocking the defendant's egress after a break, were demanding and accusatory, did not advise him he was free to leave, and insisted that the defendant talk).

Detective Malach testified that he told the defendant she did not have to come with him, but he asked for her cooperation. He testified that he wanted to drive her due to potential health concerns, although the defendant had told him she was capable of driving. According to the defendant, Detective Malach asked her to ride with him and told her they would return for her car. The defendant was not handcuffed or frisked, and she rode in the front seat, engaging in casual conversation on the way to the station.

27

Detective Malach locked the vehicle doors during the ride, but the defendant testified that the door could be opened from the inside by the passenger. The defendant testified that she asked to retrieve her purse prior to leaving and that she had her purse and telephone with her throughout the interview. The defendant was left alone on a bench in the hallway for approximately thirty minutes. She was also left alone in the interview room for approximately thirty minutes at one point. According to the defendant, while she was seated in the hallway immediately outside the interview room, she could have gotten up and left the station, but it did not occur to her to do so.

The trial court found that the defendant was not in custody. We agree with the trial court. The defendant accompanied Detective Malach to the police station voluntarily. The interview was during regular working hours, was not lengthy, and the detective's demeanor was courteous. Although Detective Malach asked about the possibility that the defendant harmed the babies and although he indicated that trauma would be discovered in the autopsy, he did not question the defendant in an overly accusatory way. While she did not have her own transportation, she retained possession of her bag and telephone, and she was told she would be returned to her vehicle. She was left unattended on more than one occasion, and there was no physical obstacle to the defendant leaving. There were also no obstacles to her using her telephone. The defendant never indicated she wished to end the interview or that she wished to leave, and she was made aware of her right to remain silent and not speak to police both at the dental office and at the police station. We conclude the defendant was not in custody.

## B. *Miranda* Warnings

"There is a 'hairline of distinction' between the investigatory stage and the accusatory or custodial stage" in an investigation. *Darnell*, 905 S.W.2d at 958. An encounter which does not meet the definition of custodial interrogation may turn into a custodial interrogation based on the totality of the circumstances. *Dailey*, 273 S.W.3d at 104; *Payne*, 149 S.W.3d at 33-34. While the defendant was never informed that she was under arrest, was told that "[a]ll this is voluntary" when being asked permission to search her vehicle after her confession, and was taken to the hospital rather than jail after acknowledging her role in the children's deaths, we nevertheless note that, even if the interrogation became custodial after her initial statement that she caused the deaths, the defendant was adequately apprised of her rights at the beginning of the interview.

The accused may knowingly and intelligently waive his or her *Miranda* rights. *State v. Climer*, 400 S.W.3d 537, 557 (Tenn. 2013) see also Miranda, 383 U. S. at 479. The State is required to prove waiver by a preponderance of the evidence. *State v. Freeland*, 451 S.W.3d 791, 814 (Tenn. 2014). If the accused invokes the right to counsel

prior to or during the interrogation, law enforcement must cease further questioning. *Id.* The invocation of the right to counsel is analyzed under an objective standard to determine whether the invocation was clear and unequivocal. *State v. Turner*, 305 S.W.3d 508, 517 (Tenn. 2010) *abrogated on other grounds as recognized by Climer*, 400 S.W.3d at 562. Although the Tennessee Supreme Court has noted that clarifying an ambiguous request for counsel is good practice, "police need not cease questioning until and unless a suspect unequivocally invokes the right to counsel." *Climer*, 400 S.W.3d at 562 n.14. "The accused 'must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer … would understand the statement to be a request for an attorney.'" *State v. Saylor*, 117 S.W.3d 239, 246 (Tenn. 2003) (quoting *State v. Huddleston*, 924 S.W.2d 666, 670 (Tenn.1996)).

Even if the suspect does not invoke his or her right to counsel or right to remain silent, the State must establish by a preponderance of the evidence that any waiver of the rights was made knowingly, voluntarily, and intelligently. *State v. Blackstock*, 19 S.W.3d 200, 207 (Tenn. 2000). To show that the wavier was knowingly and voluntarily made, the State must show that it was the product of free and deliberate choice and not intimidation, coercion, or deception and that it was made with a full awareness of the nature of the rights being waived and the consequences of the decision to waive them. *Freeland*, 451 S.W.3d at 814. The accused may not be "coerced, threatened, or tricked" into waiving his or her rights. *Id*.

An explicit waiver may be written or oral. *State v. Steven James McCain*, No. M2000-02989-CCA-R3CD, 2002 WL 1033249, at *6 (Tenn. Crim. App. May 22, 2002). In addition, "the State may establish an implicit waiver of *Miranda* rights by showing that the suspect received and understood *Miranda* warnings, did not invoke *Miranda* rights, and gave an uncoerced statement to the police." *Climer*, 400 S.W.3d at 565.

Here, Detective Malach read the defendant her rights as required by *Miranda*. The discussion included the following exchange:

> Q. …. You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to talk to an attorney and have him here before being questioned. If you cannot afford one, one will be appointed to you. And you have the right to stop talking at any time. So if we're talking and you don't want to answer that question, that's fine. We'll just move on. All right? You understand all that. Right?
> A. Uh-huh.
> Q. Okay. You don't mind if I talk to you then?

29

A. No. Are you -- should I have an attorney?

Q. You don't have to have an attorney. That -- that's why I'm talking to you now and that's why we're discussing you have the right to one. If you want to talk a little bit and -- and see what's going on and -- my thing is, I want to get to the bottom of what's going on and I'd love to have your cooperation so we can work together to do that. Okay?

A. Okay.

Q. So do you have any problem with me talking to you?

A. Huh-uh,

Q. Okay. And let me say, at any point in time you don't want to answer something, say, Steve, I'd rather not answer that question. And we're just talking – and then I'll rephrase the question and we'll move on. Okay? It's going to be -- we're going to talk freely. All right? And we're going to try to make heads or tails of what's going on in a bad situation. Okay? So that's pretty much all we want to do.

The defendant was informed of her rights and waived them orally. In her brief, the defendant falls just shy of conceding that the statement "should I have an attorney" was equivocal. We conclude that her question is indistinguishable from similar statements which appellate courts have concluded were equivocal. *See*, *e.g.*, *Climer*, 400 S.W.3d at 563 (Tenn. 2013) (among other references to an attorney, defendant asked, "You mean I can have an uh an appointed lawyer right now?"); *Saylor*, 117 S.W.3d at 243, 246 (defendant's several references to a lawyer included, "I'm supposed to have a lawyer though, don't I?"). The defendant argues that her waiver was the result of deception because Detective Malach's answer could be interpreted as a statement that she did not need an attorney and because he told her that if she did not want to answer a question, he would "rephrase the question." The trial court found that Detective Malach gave adequate *Miranda* warnings and the warnings were not invalidated by trickery. We conclude that the record supports this finding.

The defendant argues that Detective Malach's statement, "You don't have to have an attorney," misled her regarding the nature of her right to counsel. However, the more literal reading is that Detective Malach was informing the defendant that an attorney was not compulsory during the interview and that they could proceed with the interview without counsel. Detective Malach had just told the defendant that she had a right to an attorney, told her she had the right to an attorney at the dental office, and followed the statement to which the defendant objects by informing her, "[Y]ou have the right to one."

30

We do not think that Detective Malach's statement invalidated the warnings he had just given.

In attempting to clarify the defendant's right to stop questioning, Detective Malach also told her that if she did not wish to respond to a question "then I'll rephrase the question and we'll move on." The defendant argues that this description implied that the defendant would have to answer the same question after it had been rephrased. However, Detective Malach had earlier explained her right to refuse to answer a particular question by stating, "So if we're talking and you don't want to answer that question, that's fine. We'll just move on." He had also told her, "[Y]ou have the right to stop talking at any time." The defendant was college-educated. She was informed of her rights informally at the dental office and again formally at the police station. She indicated that she understood her rights, and she orally indicated that she wished to waive them. She never indicated a desire to assert her right to remain silent. We conclude that there was no violation of *Miranda*.

## C. Voluntariness of Waiver

The defendant's argument also asserts that her waiver was not voluntary because of the state of her mental and physical health.[2] "Although there is likely to be a level of deficiency so great that it renders a defendant unable to make a knowing and intelligent waiver, nearly every court to consider the issue has held that mental impairments or mental retardation are factors that must be considered along with the totality of the circumstances" in evaluating the voluntariness of a waiver. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000). Courts consider the defendant's age, background, education, intelligence, reading and writing skills, demeanor and responsiveness to questioning, prior experience with the criminal justice system, mental disease or disorder or intoxication, and the manner, detail, and language in which the *Miranda* rights are explained. *State v. Echols*, 382 S.W.3d 266, 280-81 (Tenn. 2012). The totality of circumstances must show "'an uncoerced choice and the required level of comprehension before a court can properly conclude that *Miranda* rights have been waived.'"

_____

[2] The defense asserts that the trial court confused the issue of the voluntariness of the statement with the issue of whether the waiver was voluntary. *See Freeland*, 451 S.W.3d at 815 (noting that the test to determine voluntariness of a statement is separate from the determination that a waiver is valid). While the defendant's brief contains one sentence asserting the statement was not voluntary, there is no legal argument accompanying the assertion, and we agree with the State that her statement was not the product of coercive State action. *State v. Downey*, 259 S.W.3d 723, 733 (Tenn. 2008) ("The United States Supreme Court has held that in order for a confession to be involuntary, it must be the product of coercive state action.").

31

*Blackstock*, 19 S.W.3d at 208 (quoting *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)).

In *State v. Bush*, the defendant, who suffered from paranoid schizophrenia, introduced evidence that he had executed the waiver of his rights due to mental illness, and his psychiatrist offered the opinion that the waiver was not a product of rational reasoning. *State v. Bush*, 942 S.W.2d 489, 498 (Tenn. 1997). The Tennessee Supreme Court noted that *Miranda* protects against the coercive conduct of the government but not against compulsions originating within the psyche of the accused. *Id.* at 501. The Court noted that the defendant "appeared normal, was coherent and responsive to questioning, and did not discuss … delusions," and concluded that, "in the absence of police overreaching, the waiver was valid." *Id.*; *see State v. Clayton Eugene Turner, II*, No. 03C01-9805-CR-00176, 1999 WL 817690, at *8 (Tenn. Crim. App. Oct. 6, 1999) (concluding there was no overreaching when the defendant referenced past delusions but appeared competent); *State v. James Christopher Tatrow*, No. 03C01-9707-CR-00299, 1998 WL 761829, at *13 (Tenn. Crim. App. Nov. 2, 1998) (concluding that waiver was valid when there was no overreaching by law enforcement, even though the defendant was experiencing cocaine and methamphetamine withdrawal); *see also State v. James C. Osborne*, No. M2005-00893-CCA-R3CD, 2006 WL 2682773, at *9 (Tenn. Crim. App. Sept. 7, 2006) (concluding that waiver was knowingly, intelligently, and voluntarily made despite defendant's intoxication when defendant was able to give a detailed account of his actions).

In *State v. Blackstock*, the Tennessee Supreme Court concluded that the trial court erred in finding that the mentally retarded defendant's waiver was valid, because the State had not shown that the defendant "had a meaningful awareness of his *Miranda* rights, as well as the consequences of waiving his rights." *Blackstock*, 19 S.W.3d at 209. On the other hand, when a defendant demonstrates a capability of understanding his or her rights and the consequences of giving them up, waivers have been upheld. *See*, *e.g.*, *State v. Brandon Johnson*, No. W2007-01655-CCA-R3-CD, 2009 WL 2151814, at *7 (Tenn. Crim. App. July 17, 2009) (concluding that the waiver was valid when the defendant had extensive experience with the criminal justice system, responded coherently, indicated he understood his rights, and showed no confusion in detailed narrative despite mild retardation); *State v. Steven Murphy*, No. W2004-02899-CCA-R3-CD, 2006 WL 432388, at *11 (Tenn. Crim. App. Feb. 22, 2006) (concluding that the defendant, who had relatively high IQ, prior experience with the criminal justice system, and indications of malingering, had validly waived his rights).

The defendant's expert witness testified that her thinking at the time of the police interrogation was affected by physical impairments such as blood loss and postpartum hormonal shifts. He also testified that she was cognitively capable of understanding her

rights but would not be emotionally capable of asserting her rights due to her passive personality and mental defects such as depression, anxiety, and dissociative disorder associated with her childhood medical problems. However, the defendant appeared normal, coherent, and responsive. She came to the interview from her work, where she had been performing her duties apparently without difficulty that morning. She was twenty-five years old, college-educated, responsive to questioning, and although she had no prior experience with the criminal justice system, her rights were explained to her. She indicated that she understood and wished to waive her rights. Any mental or physical defects from which she suffered were not apparent, and her psychiatrist testified that she was capable of cognitively understanding her rights. Unlike the defendant in *Blackstock*, she had a meaningful awareness of her rights and the consequences of waiving them. We conclude that any mental defects did not render her waiver involuntary or unknowing.

### III. Exclusion of Dr. Auble's Testimony at the Hearing on the Motion to Suppress

The defendant alleges error in the exclusion from the hearing on the motion to suppress of Dr. Auble's testimony regarding the defendant's statement to police. She also asserts error in the trial court's refusal to allow the defendant to question Dr. Auble in an offer of proof. The defense cites Tennessee Rule of Evidence 103(b) for the proposition that the trial court must allow an offer of proof in question and answer form. She asserts that the exclusion of the testimony and denial of the right to make an offer of proof according to Rule 103 was tantamount to a denial of her right to a fair trial and due process.

At the hearing on the motion to suppress the defendant's statement, the defense attempted to call Dr. Auble to testify, and the State objected. The State argued that it had not been aware that Dr. Auble would testify at the hearing and that her testimony regarding diminished capacity did not affect the voluntariness of the statement. The trial court attempted to discern whether Dr. Auble would testify that the defendant was not capable of waiving her rights. Defense counsel stated that Dr. Auble would testify regarding how the defendant's mental diseases and defects would affect her ability to assert her right to remain silent. The trial court decided to call Dr. Auble to the stand *sua sponte* to determine whether it would admit her testimony. After Dr. Auble testified that she saw the defendant on September 23, 2011, and that she did not review the defendant's statement, the trial court excluded the testimony. The trial court ruled that Dr. Auble could not testify, in part because she had not reviewed the statement and in part because "significant intervening events" may have affected the defendant's mental state.

Trial counsel then asked to make an offer of proof. The trial court ruled that counsel's statements, along with Dr. Auble's report, constituted a sufficient offer of proof, and it refused to permit counsel to question Dr. Auble regarding the defendant's statement. The trial court did, however, permit the testimony of Dr. Kenner. Dr. Kenner testified about the various mental diseases that the defendant suffered from and about her history of childhood medical trauma. Dr. Kenner testified that, while the defendant was capable of understanding her rights cognitively, she would emotionally be incapable of asserting her rights in the face of a powerful male interrogator. He further testified that Detective Malach's interrogation was coercive and bullying and that "elements of the statement" were "clearly against her will or what she … knew happened."

After the denial of the motion, the defense made the affidavit of Dr. Auble part of the record. Dr. Auble's affidavit stated that she had evaluated the defendant and that the defendant's thinking and reasoning were impaired at the time of the evaluation and "[m]ore likely than not" also at the time of the crime and interrogation. She stated that the defendant would be compliant and susceptible to manipulation by people in authority and that these traits would have affected her responses during the interview. Dr. Auble reaffirmed that she would have testified that the defendant was more likely than not impaired at the time of the interview.

## A. Offer of Proof

Tennessee Rule of Evidence 103(b) provides that the trial court may establish a record including "any other or further statement which shows the character of the evidence, the form in which it was offered, the objection made, and the ruling." Tenn. R. Evid. 103(b). The trial court "shall permit the making of an offer in question and answer form." *Id.*

An offer of proof serves to inform the trial court of the exact nature of the evidence so that it can make an informed decision regarding admissibility, and it serves to create a record for the appellate court to determine if there was reversible error. *Taylor v. State*, 443 S.W.3d 80, 84 (Tenn. 2014). Generally, "'it is error for the trial court to refuse to permit counsel to state what evidence he is offering.'" *Alley v. State*, 882 S.W.2d 810, 815 (Tenn. Crim. App. 1994) (quoting 89 A.L.R. "Offer of Proof – Ruling – Error" § 2 at 283 (1963)). This is true unless it is obvious from the record that the evidence could not, under any circumstances, be relevant to the contested issues. *Taylor*, 443 S.W.3d at 84. Likewise, "it is apparent that courts are required, in appropriate circumstances, to allow offers of proof when evidence is excluded so as to enable consideration of the issue on appeal." *Alley*, 882 S.W.2d at 815-16. The court in *Alley* concluded that "if the obvious incompetence or irrelevance is not readily apparent from

34

the record, it is error to exclude any reasonable offer which demonstrates the relevance and general import of the excluded evidence." *Id.* at 816.

An erroneous refusal to allow an offer of proof, however, does not necessarily require reversal. *Id.* Failure to permit an offer may be harmless error. *See State v. Martin*, 642 S.W.2d 720, 724 (Tenn. 1982) (holding that the trial court erred in not permitting an offer of proof regarding the defendant's proposed testimony but that the error was harmless because the defendant was convicted of five crimes that were clearly admissible, in addition to the two crimes that the defendant claimed were not admissible, and these five were the basis of the choice not to testify). Instead, whether the error is reversible depends on the facts and circumstances of the case, including "'the apparent nature and admissibility of the evidence and its relation to determinative issues.'" *Alley*, 882 S.W.2d at 816 (citation omitted); *see Bray v. State*, 450 S.W.2d 786, 787 (Tenn. Crim. App. 1969) (concluding that trial judge's exclusion of testimony and denial of an offer of proof required reversal because the appellate court could not determine that the error was harmless in the absence of the offer of proof).

The court in *Alley v. State* examined the method of the offer and held that "not only are question and answer offers such as were attempted in this case appropriate, they are preferred, and the trial court must allow them when appropriately offered." *Alley*, 882 S.W.2d at 817. However, limiting the method of the offer of proof is also subject to harmless error analysis. *State v. William Phillip Graham*, No. W2006-00173-CCA-R3-CD, 2007 WL 2404303, at *11 (Tenn. Crim. App. Aug. 22, 2007) (concluding that the trial court did not err in refusing a proffer for irrelevant evidence and that error in refusing the question-and-answer proffer for other proof required a demonstration of prejudice).

In *State v. Torres*, the defense attempted to introduce a videotape of an interview with police that had been conducted prior to the defendant's confession, and the trial court refused to review the tape or allow the defendant to make a full offer of proof. *State v. Torres*, 82 S.W.3d 236, 250 (Tenn. 2002). The Tennessee Supreme Court noted that, while refusal to allow an offer of proof is generally error, the inclusion of the excluded videotapes in the appellate record served to provide an adequate basis for appellate review and the parties verbally summarized the nature of the evidence so that the trial court could make a ruling. *Id.* at 251. The Court concluded that this satisfied the two primary purposes of an offer of proof. *Id.* Accordingly, the Court held that any failures in the offer of proof did not, independently, entitle the defendant to relief. *Id.* at 251, 252-53 (holding that the video was excluded in error but that the error was harmless).

We conclude that in this case, the defendant is not entitled to relief based on the refusal to permit an offer of proof at the suppression hearing in the form of questions and answers. Although the trial court did not abide by the language of Tennessee Rule of Evidence 103(b), the evidence in the record, consisting of Dr. Auble's report and the statements of defense counsel, was adequate to give the trial court a basis for ruling on admissibility, and this evidence, together with Dr. Auble's affidavit, is also sufficient to allow appellate review. As in *Torres*, the two primary purposes of an offer of proof were met in this case, and the trial court's error does not entitled the defendant to relief.

## B. Admissibility

The trial court refused to allow Dr. Auble's testimony because it concluded that her examination of the defendant was too remote from the time of her statement and because Dr. Auble had not reviewed the statement to police. The trial court repeatedly asked trial counsel if Dr. Auble would testify that the defendant was incapable of knowing that she was giving up her rights, and defense counsel's responses centered around Dr. Auble's diagnoses regarding the defendant's mental defect or disease. Dr. Kenner was then permitted to testify that the defendant would be able to understand her rights cognitively but would not be able to assert them.

A trial court has broad discretion regarding the admissibility of expert testimony. *State v. Ballard,* 855 S.W.2d 557, 562 (Tenn. 1993). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion which is against logic or reasoning and causes an injustice to the complaining party. *State v. Ayers*, 200 S.W.3d 618, 620 (Tenn. Crim. App. 2005). Under Tennessee Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue," an expert witness may "testify in the form of opinion." Tenn. R. Evid. 702. The trial court, however, is required to exclude the testimony "if the underlying facts or data indicate a lack of trustworthiness." Tenn. R. Evid. 703. Accordingly, testimony is only admissible if it is based on reliable facts and data. *Ayers*, 200 S.W.3d at 621. The trial court's gatekeeping function is meant "to ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 275 (Tenn. 2005) (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999)). The trial court must make sure that the basis of the opinion supports the expert's conclusions and that there is no "analytical gap" between the data and the opinion. *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002).

In *State v. Brimmer*, the defendant's expert wished to testify that the defendant was an individual who could plausibly have been coerced into a false confession. *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994). The trial court, however, excluded the testimony because the doctor had only listened to a small portion of the taped confession. *Id.* The court premised its exclusion on the conclusion that the basis of the expert's opinion was not sufficiently trustworthy, and the Tennessee Supreme Court upheld the decision. *Id.* We conclude that the trial court did not abuse its discretion in excluding the testimony based on the fact that Dr. Auble's testimony centered on the reliability of a statement she had not reviewed.

Even if we were to conclude that the trial court erred in refusing to admit Dr. Auble's testimony, any such error would be harmless. Dr. Auble's affidavit stated that she would have testified that the defendant's thinking and reasoning were more likely than not impaired at the time of the interrogation and that the defendant would be susceptible to manipulation by people in positions of authority. Dr. Kenner's testimony also stated that the defendant was susceptible to manipulation and that she was suffering from blood loss and hormonal swings, which would have a cognitive and emotional impact. Dr. Auble's excluded testimony merely corroborated Dr. Kenner's testimony. Moreover, the trial court reconsidered the motion to suppress in February, after Dr. Auble had filed her affidavit, when the defendant presented additional evidence on the issue of custody. Finally, Dr. Auble's proposed testimony did not cast doubt on the fact that the defendant appeared to have "a meaningful awareness of [her] *Miranda* rights, as well as the consequences of waiving [her] rights." *State v. Blackstock*, 19 S.W.3d 200, 209 (Tenn. 2000). Dr. Auble's testimony was that the defendant, due to internal compulsion, would be more susceptible to waiving her rights. *See State v. Bush*, 942 S.W.2d 489, 501 (Tenn. 1997). We conclude that, even if the exclusion of the evidence were error, any error is harmless.

## IV. Right to an Impartial Judge

The defendant also contends that her right to an impartial judge was violated. Primarily, the defendant points to the trial court's admonitions regarding her displays of emotion during the trial. The defendant alleges that the trial court's limitations on the defense's cross-examination of Mr. Lowe regarding the defendant's church activities also illustrates the court's bias. The defendant alleges bias in the trial court's admonitions to trial counsel during the hearing on the motion for interlocutory appeal of the denial of her statement's suppression, asserting that the court's comments gave rise to an appearance of bias. The defendant likewise raises the failure to permit an offer of proof regarding Dr. Auble's testimony in question-and-answer form as evidence of bias.

37

Initially, we note that, after the trial court denied the motion for interlocutory appeal of the statement's suppression, trial counsel on January 17, 2013, moved for recusal based on the trial court's comments during the hearing. The comments in question were:

> Now, before I get into this, there's something I want to take up with the attorneys here. I respect the attorneys in this case immensely. I know three of you, and [co-counsel is] relatively new to the practice of law -- the three of you for an extremely long time as an attorney, a fellow attorney, and as a judge. And anything that any of you all represent to me, I consider truth. I consider each and every one of you upmost examples of integrity and honestly in the way that you should represent your respective interests in the criminal court.
>
> You are leaders of your profession, but I'm going to tell you, as a father might speak to a son, sternly, that I'm disappointed in this particular pleading. The motion … is sloppy and it's not correct. And that's why I am bringing this to your attention before we go through the argument.

The trial court elaborated that it believed defense counsel had not adequately summarized its finding that the defendant was not in custody, making the appellate arguments regarding *Miranda* moot. The trial court also took offense that the defense asserted it was not permitted to make an offer of proof. The trial court asserted that the statements of counsel and the report were sufficient to make an offer of proof, and it objected that Dr. Kenner's testimony was not mentioned in the motion seeking interlocutory appeal. The trial court stated that it was "striking all that because it is so misrepresentative of what happened here." The trial court then stated that it would not "strike anything. I'll ignore it." At the hearing on the motion for permission to appeal, Detective Malach testified that the motion to suppress was not dispositive of the State's case.

In the subsequent motion to recuse, the defendant raised as evidence of bias the trial court's comments, the trial court's legal rulings regarding the testimony of Dr. Auble, its "argumentative" questions to Dr. Kenner, and its raising of the custody issue *sua sponte*. The trial court denied the motion, finding that the court was not biased but had merely objected to what it perceived as a failure to summarize its ruling by excluding the finding that the defendant was not in custody. It further noted:

38

Let me state those comments were predicated by respect for the attorneys. They were not personal. They were professional. That is what I'm called to do as a trial judge and comment about sloppy work. Also, judges are not robots with monotone voices or computer voices like you do when you call and try to get somebody on the phone, it's important and you can't get a human. Not like these smartphones when you talk to somebody that is not a human. Attorneys should not mistake emotion from the judge in making a ruling with allowing emotion to control the judge's application of the law in presiding over a case.

On February 26, 2013, this court denied the defendant's appeal of the recusal decision. Conducting a de novo review, this Court concluded that "while the trial judge may have spoken a little too candidly at times, we do not believe any of his comments rise to the level of creating an unfair bias or prejudice toward the Appellant or her attorneys." *State v. Lindsey Brooke Lowe*, No. M2013-00447-CCA-10B-CD, 2013 WL 706318, at *5 (Tenn. Crim. App. Feb. 26, 2013). This is now the law of the case, and accordingly, we do not address the defendant's arguments based on the trial court's pretrial actions.

The State asserts that any argument that the trial court should have recused itself for bias based on its actions during trial is waived for failure to move for a recusal. The State is correct that defense counsel did not specifically move for recusal during trial. Defense counsel did, however, move for a mistrial, and in doing so, he raised the issue of the judge's partiality as evidenced by the admonitions to the defendant regarding her demeanor and as evidenced by the limitation on cross-examination. The defense noted that the appeal of the recusal had been denied but that the defense felt "that Your Honor does not treat the district attorney in the same fashion, and because of that, we move for a mistrial as well." In rejecting the motion, the trial court addressed allegations of its own partiality. The trial court quoted extensively from this court's denial of the appeal of the recusal, and the trial court found: "There is absolutely no mention of any other basis for recusal in the entire history of the case -- other than today there is a double standard issue being raised." The trial court concluded that it had "no partiality" and that "the record absolutely demonstrates the trial court's fairness and impartiality." The argument was presented as an argument that the trial court was not impartial, and the trial court addressed both allegations of partiality and whether there were any basis for recusal. We conclude the argument is not waived.

Article VI, section 11 of the Tennessee Constitution provides that "[n]o Judge of the Supreme or Inferior Courts shall preside on the trial of any cause in the event of

39

which he may be interested." Accordingly, the right to a trial before an impartial judge is constitutional in nature. *Bean v. Bailey*, 280 S.W.3d 798, 803 (Tenn. 2009). Rule of Judicial Conduct 2.11 provides that "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." Tenn. Sup. Ct. R. 10, R.J.C. 2.11(A). A judge is further required to perform his or her duties "without bias or prejudice." Tenn. Sup. Ct. R. 10, R.J.C. 2.3(A). Because the appearance of bias is injurious to the integrity of the legal system whether or not bias actually exists, a judge should disqualify himself or herself "'when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564-65 (Tenn. 2001) (quoting *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)). The test is an objective one. *Bd. of Prof'l Responsibility v. Slavin*, 145 S.W.3d 538, 548 (Tenn. 2004). Bias is present when a judge has expressed an opinion on the merits of a case prior to hearing evidence, has taken a position favorable or unfavorable to a party prior to a hearing, or has prejudged factual issues. *Alley*, 882 S.W.2d at 822. An appellate court reviews a trial court's decision on recusal under an abuse of discretion standard. *State v. Odom*, 336 S.W.3d 541, 576 (Tenn. 2011).

A judge presiding at a trial "must be sufficiently neutral and free of preconceptions about the factual issues to be able to render a fair decision." *Alley*, 882 S.W.2d at 820 (quoting Charles W. Wolfram, *Modern Legal Ethics* 988 (1986)). However, "[n]ot every bias, partiality, or prejudice merits recusal. To disqualify, prejudice must be of a personal character, directed at the litigant, 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from ... participation in the case.'" *Alley*, 882 S.W.2d at 821 (quoting *State ex rel. Wesolich v. Goeke*, 794 S.W.2d 692, 697 (Mo. Ct. App. 1990)). Bias based on actual observation of witnesses and evidence during trial does not disqualify the judge unless it is so pervasive that it is sufficient to deny the litigant a fair trial. *Alley*, 882 S.W.2d at 821. Adverse rulings alone do not establish bias meriting disqualification, even if "erroneous, numerous and continuous." *Id.*

Here, the defendant alleges that the trial court was biased because of its admonitions regarding her show of emotions, including the court's instruction, "If you need a break, we'll take a break, but you sit there and you don't show any emotion to this jury. Like I said, their job is hard enough." The trial court warned the defendant, "I will not have you sitting there acting like a child or displaying emotion uncontrolled. The next time that this happens, you will be excluded from this courtroom." The trial court had previously noted for the record that the defendant had put her head down and her hands over her ears during the testimony of Mr. Smith. The court informed trial counsel, "She is acting like a child. She has her head down, her ears covered, and I'm not going to tolerate that."

In denying the defendant's motion based on the admonition, the trial court found that the defendant's act of putting her head down and covering her ears with her hands was "a known, intentional response."

We conclude that the trial court's comments, including the threat to exclude the defendant, do not in themselves establish that the defendant was deprived of an impartial judge. Although the defendant has a right to be present at trial, this right can be waived by disruptive conduct under certain circumstances. Tenn. R. Crim. P. 43(a), (b)(2); *see State v. Ballard*, 21 S.W.3d 258, 261 (Tenn. Crim. App. 2000). Examples of disruptive conduct include profane gestures combined with argumentative or non-responsive answers and a refusal to submit to cross-examination during testimony; spontaneous proclamations to the jurors on multiple occasions that the trial is unfair and trial counsel unprepared; or physical assaults. *See State v. Mosley*, 200 S.W.3d 624, 634 (Tenn. Crim. App. 2005); *State v. William J. Ford*, No. W2000-01205-CCA-R3CD, 2002 WL 1592746, at *7 (Tenn. Crim. App. July 12, 2002); *State v. Cole*, 629 S.W.2d 915, 917 (Tenn. Crim. App. 1981). During the course of trial, the court at first expressed a concern that the defendant's emotions would hinder her ability to assist counsel in her own defense. The trial court and trial counsel agreed that trial counsel would ask for, and be given, a break whenever counsel noticed that the defendant was becoming emotional. In denying any relief based on its alleged partiality, the trial court found that its statements to the defendant, including the threat of excluding her from trial, were based not on an involuntary show of emotions but on her "known, intentional response" of covering her ears and putting down her head during testimony. While the defendant's conduct was not as disruptive as the behavior cited in *Mosley*, *Ford*, or *Cole*, and while the trial court's admonition may have been confusing in not narrowing the particular conduct at issue, the court's decision was based on observation of witnesses and evidence during trial. *Alley*, 882 S.W.2d at 821. The trial court had the duty to control the proceedings. *State v. Lemaricus Devall Davidson*, No. E2013-00394-CCA-R3-DD, 2015 WL 1087126, at *35 (Tenn. Crim. App. Mar. 10, 2015). Accordingly, the trial court did not abuse its discretion in failing to recuse itself or denying a mistrial based on allegations of partiality.

Likewise, the trial court's decision to limit the cross-examination of the defendant's father regarding her church activities does not indicate bias warranting recusal. On cross-examination, the prosecution asked the defendant's father if the defendant had sung a solo at her church on Christmas after the deaths of her children, and the defendant's father stated that the family had begun to attend the early Sunday service and that the defendant had sung a solo. The defense did not object to this line of questioning, but on redirect examination, trial counsel asked the defendant's father about other church activities in which the defendant participated. The defendant's father

41

testified that she went on a mission trip and weekend retreat, and the prosecution then objected based on relevance. The trial court stated that the lack of objection by defense to the prosecution's questions did not make the material relevant or admissible but allowed trial counsel to pursue the line of questioning, instructing counsel to "be brief."

The defendant does not argue that the testimony that the trial court ultimately admitted but limited was relevant. Neither does she allege that this exchange was based on extra-judicial observations or a prejudgment on the merits of the case. An adverse ruling is not sufficient to establish bias. *Alley*, 882 S.W.2d at 821. We conclude that the defendant was not denied her right to an impartial judge.


## V. Right to Testify

The defendant next argues that the trial court's comments regarding her displays of emotion effectively denied her the right to testify. She claims that her "election not to testify was caused by (or at a minimum significantly influenced by) her apprehension" that the trial court would exclude her from the courtroom should she become emotional.

The defendant asserts that the trial court's actions were an effective denial of her constitutional right to testify in her own behalf. We note initially that any error was not constitutional. "Because the defendant was free to testify despite the trial court's [admonitions], this case does not involve the deprivation of a fundamental constitutional right." *State v. Galmore*, 994 S.W.2d 120, 125 n.3 (Tenn. 1999) (concluding that erroneous admission of prior convictions which may have affected the defendant's choice not to testify was not constitutional error); *compare Momon v. State*, 18 S.W.3d 152, 166-67 (Tenn. 1999) (holding that counsel's unilateral waiver of the right to testify was subject to constitutional harmless error analysis).

A defendant can premise relief on an error that prevents him or her from exercising the right to testify. In *State v. Herron*, the Tennessee Supreme Court found that cumulative error – including an erroneous ruling that certain prior convictions and arrests would be admissible as impeachment should the defendant testify – entitled the defendant to appellate relief. *State v. Herron*, 461 S.W.3d 890, 911-12 (Tenn. 2015). The Court's decision rested in part on the fact that "the defendant decided not to testify only after the trial court twice erroneously ruled that, if he did so, the State would be permitted to question him about prior arrests and convictions." *Id.* at 911.

Nevertheless, a defendant must make some showing of prejudice stemming from the error. Generally, relief is only appropriate where "error involving a substantial right more probably than not affected the judgment." Tenn. R. App. P. 36(b). In *State v.*

42

*Galmore*, where the trial court erroneously admitted impeachment evidence, the Court concluded that "[d]epending upon the facts and circumstances of a case, an offer of proof may be the only way to demonstrate prejudice." *Galmore*, 994 S.W.2d at 125. However, in analyzing the prejudice from the erroneous ruling, the *Galmore* Court held that "neither an offer of proof nor a showing that the defendant would have testified but for the trial court's ruling is *required* in order to preserve for review a claim of an erroneous ruling on admissibility of a prior conviction for impeachment purposes." *Id.* (emphasis added). In analyzing prejudice, the Court ultimately concluded that "[t]he defendant's assertion that he would have refuted the confession . . . is not supported by the record." *Id.* The Court in *Herron*, on the other hand, granted relief because it concluded that the record established "[t]hat the trial court's erroneous ruling more likely than not influenced the defendant's decision." *Herron*, 461 S.W.3d at 911; *see also State v. Taylor*, 993 S.W.2d 33, 35 (Tenn. 1999) (denying relief where impeachment evidence was erroneously admitted but there was no evidence of proposed testimony or theory of defense for which testimony would have been critical).

The defendant insists that the trial court's admonition to her regarding her emotional responses led to her decision not to testify. The defendant reiterates the claim that the trial court's admonition was indicative of bias, but she points to no particular rule of law that the trial court violated in giving the admonition. *See State v. Lemaricus Devall Davidson*, No. E2013-00394-CCA-R3DD, 2015 WL 1087126, at *35 (Tenn. Crim. App. Mar. 10, 2015) (concluding that "it is the duty of the trial court to control the proceedings" and that the court has broad discretion over the course and conduct of the trial, including wearing of memorial buttons for victims).

The record reveals that the defendant was emotionally affected by testimony throughout the course of the trial. After the 911 tape was played, the trial judge expressed concern about her mental state, informed counsel that he wanted to make sure the defendant could assist in her defense, and clarified that trial counsel would be granted a break if they believed the defendant needed one in order to gain control of her emotions. The defendant became emotional during the testimony of Mr. Smith, putting her head down and her hands over her ears. During discussions in chambers and outside the presence of the defendant, trial counsel informed the court that, despite preparation for the defendant's testimony, he did not think he would "be able to call her as a witness in her own defense simply because I don't think she can do it. I don't think she can emotionally get through it." This was prior to the trial court's admonition to the defendant. Trial counsel reiterated prior to the *Momon* hearing that the defendant "dreads testifying." Furthermore, the defendant herself declared that she would not testify because "I just don't feel like I can emotionally handle it." The record reflects that she was properly informed of her right to testify and chose to waive that right. The defendant

43

never presented testimony at the motion for a new trial regarding the influences on her decision not to testify.

Even if the trial court's admonitions could be considered error, the record does not support the conclusion "[t]hat the trial court's erroneous ruling more likely than not influenced the defendant's decision." *Herron*, 461 S.W.3d at 911. We cannot conclude that the defendant has demonstrated any prejudice or that the judgment was more probably than not affected. *See Galmore*, 994 S.W.2d at 125; Tenn. R. App. P. 36(b). Accordingly, the defendant is not entitled to relief on this issue. *See State v. Rimmer*, 250 S.W.3d 12, 29 (Tenn. 2008) (concluding that the fact that the defendant was not aware that cross-examination in sentencing hearing would be limited did not invalidate waiver when "the Defendant, professing complete awareness of his right to testify, acknowledged that his decision not to do so was his personal desire").

## VI. Shifting Burden of Proof

The defendant also premises relief on her contention that allowing the State to present rebuttal evidence pursuant to *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997), shifted the burden of proof to the defense in violation of her constitutional rights. The defendant argues that the State had notice of her intent to introduce proof of diminished capacity and did not address the issue in its case-in-chief, and that the procedures outlined in *State v. Hall* operate to shift the burden to the defense to disprove *mens rea*.

In *State v. Hall*, the Tennessee Supreme Court described diminished capacity as a rule of evidence in which the defendant presents "expert, psychiatric evidence aimed at negating the requisite culpable mental state." *State v. Hall*, 958 S.W.2d 679, 688 (Tenn. 1997). Diminished capacity is neither a justification nor an excuse, but simply evidence that the defendant was incapable of forming the intent required for the crime charged. *Id.* Evidence relevant to negating the capacity to form the requisite mental state due to the defendant's mental disease or defect is admissible, while evidence of mere emotional state or mental condition is not admissible. *State v. Faulkner*, 154 S.W.3d 48, 56 (Tenn. 2005).

In this case, the jury instructions informed the jury that the State bore the burden of "proving the guilt of the defendant beyond a reasonable doubt, and this burden never shifts but remains on the [S]tate throughout the trial of the case." The instructions stated that the defendant was not required to prove her innocence. The jury was also instructed that the State was required to prove all the elements of each crime beyond a reasonable doubt. More particularly, the jury was instructed:

The [S]tate must prove beyond a reasonable doubt the culpable mental state of the accused. Culpable mental state means the state of mind of the accused at the time of the offense. This means that you must consider all of the evidence to determine the state of mind of the accused at the time of the commission of the offense. The state of mind which the [S]tate must prove is contained in the elements of the offense(s) as outlined in these instructions below.

In this case, you have heard evidence that the defendant might have suffered from a mental disease or defect which could have affected her capacity to form the culpable mental state required to commit a particular offense. The testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of mental disease or defect, not just a particular emotional state or mental condition. However, it is for the jury to determine whether or not the defendant might have suffered from a mental disease or defect.

If you find from the evidence that the defendant's capacity to form a culpable mental state may have been affected, then you must determine beyond a reasonable doubt what the mental state of the defendant was at the time of the commission of the offense to determine of which, if any, offense she is guilty.

The defense moved for a judgment of acquittal at the close of the defendant's proof, arguing that the State had neglected to introduce expert evidence regarding the defendant's mental capacity in its case-in-chief and that permitting the State to introduce the evidence in rebuttal would be tantamount to shifting the burden of proof to the defendant.

In its case-in-chief, the State presented evidence from which it could be inferred that the college-educated defendant was aware that she was pregnant, that she hid her pregnancy from everyone who knew her, and that she made no preparations for birth. The defendant stated to Detective Malach that after the births, she had wanted to keep the babies quiet and had put her hand over each baby's mouth until he stopped crying. She agreed that she killed the babies and, in reference to the second baby, stated that she knew that she killed him. The State's proof also included evidence that the defendant was able to communicate with her parents immediately after the births to refuse aid, that

45

she was able to clean up the bathroom and herself so that no one would suspect she had given birth, and that she was able to place the bodies of the babies into a laundry basket, which she then moved to the far side of her bed inside her bedroom. She was able to contact her supervisor to say that she was too sick to go to work, and she had communications via text message with several people about subjects unrelated to the babies, such as an upcoming concert, trip, and television show.

The defendant is mistaken in her argument that the State did not present proof regarding her mental state. The mental state of the defendant is "often difficult to discern." *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013). "Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005). While the State's initial proof did not involve an expert opinion regarding the defendant's capacity to form the requisite *mens rea*, the State did present evidence from which the jury could have inferred that the defendant was acting intentionally and with premeditation.

After the close of the State's proof, the defendant presented expert testimony that she was unable to form the requisite *mens rea*. Had the State neglected to introduce proof of the requisite mental state of the crimes, the trial court would have been obligated to grant the defendant's motion for judgment of acquittal, but the trial court instead properly concluded that there was evidence from which the jury could find beyond a reasonable doubt that the defendant acted with premeditation, although there was also evidence from which the jury could conclude that the defendant lacked capacity to form the requisite mental state. In rebuttal, the State countered with its own expert, who testified that the defendant, although suffering from mental disease and defect, was capable of forming the intent necessary for the crimes with which she was charged. The defendant cites no legal authority for the proposition that the State must present such expert testimony in its case-in-chief. *See*, *e.g.*, *State v. Ward*, 138 S.W.3d 245, 276 (Tenn. Crim. App. 2003) (concluding that expert testimony relevant to whether an infant's death was caused by accident or mistake could properly come in only during rebuttal because the danger of unfair prejudice would substantially outweigh the probative value of the evidence if presented in the State's case-in-chief); Tenn. R. Crim. P. 12.2(b), *Advisory Comm'n Cmt.* (requiring notice of defendant's intent to introduce expert testimony regarding mental health so that the prosecution may prepare rebuttal proof).

The jury was properly instructed that the State bore the burden of proving *mens rea* beyond a reasonable doubt. The State introduced in its case-in-chief evidence from which a jury could have found that the State had established the requisite *mens rea* beyond a reasonable doubt. We conclude that the trial court did not err in denying the

46

motion for judgment of acquittal or in permitting rebuttal proof. We likewise reject the notion that *State v. Hall* shifts the burden of proof to the defendant.


## VII. Change of Venue

The defendant challenges the trial court's denial of her motion for a change of venue. Citing the extensive media coverage and the polarizing issues of the case, the defendant asserts that the trial court erred in denying the motion for a change of venue. The trial court heard the evidence presented at the motion hearing and took the matter under advisement until the *voir dire* of potential jurors had been completed. The defendant asserts that reserving a ruling on the matter was likewise error.

A criminal offense is to be prosecuted in the county where it was committed, Tenn. R. Crim. P. 18(a), but the trial court should order a change of venue "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). The Rule requires the movant to attach affidavits detailing the facts which constitute undue excitement. Tenn. R. Crim. P. 21(b).

A motion for a change of venue addresses itself to the trial court's sound discretion, and the trial court's decision will not be reversed absent abuse of discretion. *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993). "Mere exposure to news accounts of the incident does not, standing alone, establish bias or prejudice." *State v. Crenshaw*, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001). A court will not presume unfairness based on the quantity of publicity unless the trial atmosphere is "utterly corrupted by press coverage." *Crenshaw*, 64 S.W.3d at 387 (quoting *Dobbert v. Florida,* 432 U.S. 282, 303, (1977)). A juror who possesses knowledge of the facts of the case may still be qualified to serve on the panel so long as the juror can demonstrate that he or she will put aside prior knowledge and will decide the case based on the evidence presented at trial. *State v. Rogers*, 188 S.W.3d 593, 621 (Tenn. 2006) (appendix). "The mere fact that jurors have been exposed to pre-trial publicity will not warrant a change of venue." *State v. Mann*, 959 S.W.2d 503, 532 (Tenn. 1997) (appendix). Instead, the "defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him." *State v. Evans,* 838 S.W.2d 185, 192 (Tenn. 1992).

The factors which a trial court should consider in deciding whether to grant a change of venue include:

> the nature, extent, and timing of pretrial publicity; the nature
> of the publicity as fair or inflammatory; the particular content

of the publicity; the degree to which the publicity complained of has permeated the area from which the venire is drawn; the degree to which the publicity circulated outside the area from which the venire is drawn; the time elapsed from the release of the publicity until the trial; the degree of care exercised in the selection of the jury; the ease or difficulty in selecting the jury; the venire persons' familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; the defendant's utilization of his peremptory challenges; the defendant's utilization of challenges for cause; the participation by police or by prosecution in the release of the publicity; the severity of the offense charged; the absence or presence of threats, demonstrations, or other hostility against the defendant; the size of the area from which the venire is drawn; affidavits, hearsay, or opinion testimony of witnesses; and the nature of the verdict returned by the trial jury.

*State v. Sexton*, 368 S.W.3d 371, 387 (Tenn. 2012) (citing *Rogers,* 188 S.W.3d at 621-22 (appendix) (citing *State v. Hoover,* 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979))).

Here, the trial court found that there had been extensive publicity from the date of the discovery of the deaths until the date of the motion hearing and that while some publicity had been fair, some had been inflammatory. The trial court noted that the publicity permeated the area and that the crime was the topic of national news. Both the defense and prosecution had participated in the publicity. The crimes were particularly serious, and the trial court found that extensive evidence about the publicity had been introduced but that there were no threats or demonstrations. The trial court noted that there were between 160,000 and 120,000 voters in the area. The trial court found that the comments on social media and the news were threatening and hostile but not necessarily localized. The trial court found that there was undue excitement but concluded that, because several of the factors in *Hoover* hinged on the outcome of *voir dire*, it would hold the motion under advisement. After a thorough *voir dire* in which a large venire was called, a questionnaire was given, the trial court excused sixteen jurors *sua sponte*, and the defendant used seven of her eight peremptory challenges, the trial court denied the motion.

The defendant alleges that this denial was in error because she had demonstrated during the initial motion hearing that there was undue excitement in the county. The defense notes that it limited its opinion surveys to recently called jurors, distinguishing *State v. Thacker*, where the defense did not limit the poll to those qualified to sit on a

jury, and *State v. Davidson*, where an investigator conducted only "informal" surveys. *See State v. Thacker*, 164 S.W.3d 208, 236 (Tenn. 2005) (appendix); *Davidson*, 121 S.W.3d 600, 611 (Tenn. 2003). However, we observe that neither of these cases hinged on a finding that the surveys were invalid; instead, the court in *Davidson* concluded that the trial court did not abuse its discretion when it conducted a detailed *voir dire* and there was "no evidence that any juror was actually biased or prejudiced," and the court in *Thacker* concluded that there was no error because the defendant failed to exhaust his peremptory challenges, because the trial court carefully supervised *voir dire*, and because the jurors asserted that they would be impartial. *Thacker*, 164 S.W.3d at 238 (appendix); *Davidson*, 121 S.W.3d at 613.

The defendant argues that the law does not require proof of prejudice and cites Tennessee Rule of Criminal Procedure 21(a) for the proposition that the test is whether a "fair trial is unlikely." While the defendant is correct that this is the criterion the trial court should employ in deciding whether to grant a change of venue, the test for reversing a conviction based on a denial of a change of venue is quite different. In order to reverse a conviction based on the denial of a venue change, "an accused must establish 'that the jurors who actually sat were biased and/or prejudiced.'" *Davidson*, 121 S.W.3d at 612 (quoting *State v. Dellinger*, 79 S.W.3d 458, 481 (Tenn. 2002) (appendix)).

Here, the trial court initially reserved judgment in order to have the benefit of the factors addressing whether the actual venire was affected by the pretrial publicity. *See Sexton*, 368 S.W.3d at 387. We cannot conclude that holding the matter under advisement was in itself error. *See Hoover*, 594 S.W.2d at 745 (recounting that the judge "took the matter under advisement and withheld ruling until the completion of the *voir dire* examination of the prospective jurors"). The trial court here "carefully and meticulously orchestrated the jury selection process to insure that the appellant received a fair trial." *Hoover*, 594 S.W.2d at 746; *see also Davidson*, 121 S.W.3d at 612 (noting that the trial court conducted a "meticulous and detailed jury selection process"). The defendant did not exhaust her peremptory challenges, and she makes no allegations that any members of the jury that actually tried her were biased from exposure to pretrial publicity. *See Sexton*, 368 S.W.3d at 388 (concluding that the trial court did not abuse its discretion in denying a change of venue when there was no indication that the pretrial publicity adversely impacted the jury panel); *Rogers*, 188 S.W.3d at 622 (appendix) (holding that the trial court did not err in denying a change of venue when the defendant did not allege any of the jurors who served on the jury were prejudiced by publicity); *Evans*, 838 S.W.2d at 192 (concluding that the defendant did not demonstrate prejudice when the jurors who had been exposed to pretrial publicity stated that they would render a verdict based on the evidence at trial); *Thacker*, 164 S.W.3d at 237-38 (appendix) (concluding the trial court did not abuse its discretion considering "the defendant's failure to exhaust all peremptory challenges, the careful supervision of *voir dire* by the trial

49

court, and the assertion by the jurors that they could and would give the defendant a fair and impartial trial"). Accordingly, we conclude that the defendant is not entitled to relief on this issue.

## VIII. Search Warrant

The defendant also asserts that the search of her home was illegal and that the evidence from the search should have been suppressed because the search warrant failed to comply with Tennessee Rule of Criminal Procedure 41. The defendant argues that Tennessee Code Annotated section 40-6-108 cannot save the warrant because it is an unconstitutional infringement of the legislative branch on the powers of the judicial branch. The State asserts that the constitutional argument was not presented to the trial court and is therefore waived.

At the February 12, 2013 suppression hearing, the defendant argued that the failure to comply with Rule 41 rendered the warrant ineffective and that her due process rights would be compromised by the application of the Exclusionary Reform Act found in Tennessee Code Annotated section 40-6-108. The trial court found that Rule 41(d) was violated because the copies of the warrant were not exact but that the violation "was the result of a good faith mistake," that it was a "technical violation," that the error constituted "an unintentional clerical error," and that the warrant was otherwise in compliance with the Fourth Amendment. The trial court denied the motion to suppress, relying on the statute.

On February 19, 2013, the defendant filed a motion for permission to appeal the ruling under Tennessee Rule of Appellate Procedure 9 and an application for a stay during the pendency of the appeal. The defendant's brief in support of this application argued that the statute was unconstitutional. It appears that this motion was heard and denied by the trial court, and we proceed to the merits of the argument.

We note, initially, that the evidence contested includes only the physical evidence obtained pursuant to the warrant. The bodies of the children were discovered prior to the warrant's execution, as the police and paramedics attempted to render them emergency aid. The remaining physical evidence consisted of the defendant's bloody clothing, the chemical tests showing the presence of blood in the bedroom and bathroom, and the photographs of the defendant's room, including a photograph of the packaging of the maternity pads.

A trial court's findings of fact regarding a motion to suppress are binding on the appellate court unless the evidence preponderates otherwise. *State v. Williamson*, 368

S.W.3d 468, 473 (Tenn. 2012). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom,* 928 S.W.2d 18, 23 (Tenn. 1996). The party who prevailed in the trial court is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences to be made from the evidence. *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010). A trial court's application of the law to the facts is reviewed de novo with no presumption of correctness. *State v. Crutcher,* 989 S.W.2d 295, 299 (Tenn. 1999).

A warrantless search is presumed unreasonable and any evidence seized through such a search is subject to suppression by the courts. *Talley*, 307 S.W.3d at 729. Tennessee Rule of Criminal Procedure 41 mandates:

> The magistrate shall prepare an original and two exact copies of each search warrant. The magistrate shall keep one copy as a part of his or her official records. The other copy shall be left with the person or persons on whom the search warrant is served. The exact copy of the search warrant and the endorsement are admissible evidence.

Tenn. R. Crim. P. 41(d). This Rule provides "procedural safeguards [that] are intended 'to secure the citizens against carelessness and abuse in the issuance and execution of search warrants.'" *State v. Coffee,* 54 S.W.3d 231, 233 (Tenn. 2001) (quoting *Talley v. State,* 345 S.W.2d 867, 869 (1961)).

The Tennessee Supreme Court has interpreted the requirement of Rule 41 strictly. *State v. Bobadilla*, 181 S.W.3d 641, 645 (Tenn. 2005). In *State v. Hayes*, the court was faced with a strikingly similar fact pattern. *State v. Hayes*, 337 S.W.3d 235, 252 (Tenn. Crim. App. 2010). One copy of the warrant indicated it had been issued at 10:35 a.m., while the other two showed that the warrant was issued at 10:35 p.m. *Id.* The trial judge testified that he had signed the warrant in the morning; the warrant was executed in the afternoon. *Id.* This court noted that the Rule was designed "to prevent improper searches and facilitate judicial review of whether a search was executed within the scope of the warrant." *Id.* "Logically, in order to ensure that the warrant is first issued, *then* executed, not only must the time be endorsed, but the *accurate* time must be endorsed." *Id.* at 254 (emphasis in original). This court suppressed the evidence due to the failure to comply strictly with the Rule's requirements. *Id.* at 256. Likewise, in *State v. Bobadilla*, the Tennessee Supreme Court suppressed evidence when the warrant omitted the hour it was issued because the omission undermined the Rule's purpose of ensuring that "if a search warrant is executed prior to its issuance, such discrepancy will be apparent on the face of the warrant." *Bobadilla*, 181 S.W.3d at 645.

In response to courts' suppression of evidence based on clerical mistakes such as that made in *Hayes*, the Tennessee Legislature passed the "Exclusionary Rule Reform Act," Tennessee Code Annotated section 40-6-108, with an effective date of July 1, 2011. The Exclusionary Rule Reform Act provides:

> a) Notwithstanding any law to the contrary, any evidence that is seized as a result of executing a search warrant issued pursuant to this part or pursuant to Tennessee Rules of Criminal Procedure Rule 41 that is otherwise admissible in a criminal proceeding and not in violation of the constitution of the United States or Tennessee shall not be suppressed as a result of any violation of this part or any violation of Tennessee Rules of Criminal Procedure Rule 41 if the court determines that such violation was a result of a good faith mistake or technical violation made by a law enforcement officer, court official, or the issuing magistrate as defined in subsection (c).
>
> ....
>
> (c) As used in this section, unless the context otherwise requires, "good faith mistake or technical violation" means:
>
> (1) An unintentional clerical error or clerical omission made by a law enforcement officer, court official or issuing magistrate in the form, preparation, issuance, filing and handling of copies, or return and inventory of a search warrant....

T.C.A. § 40-6-108.

The defendant argues that this statute is unconstitutional. Article II, section 1 of the Tennessee Constitution provides that "[t]he powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial." Article II, section 2 elaborates that "[n]o person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." Tenn. Const. art. II, § 2. However, the Tennessee Supreme Court has recognized that "it is impossible to preserve perfectly the 'theoretical lines of demarcation between the executive, legislative and judicial branches of government.' Indeed there is, by necessity, a certain amount of overlap because the three branches of government are interdependent." *Petition of Burson,* 909 S.W.2d 768, 774 (Tenn. 1995) (quoting *Underwood v. State*, 529 S.W.2d 45, 47 (Tenn. 1975)).

Accordingly, our courts have "from time to time, consented to the application of procedural or evidentiary rules promulgated by the legislature." *State v. Mallard*, 40 S.W.3d 473, 481 (Tenn. 2001).

Generally, only the Tennessee Supreme Court has authority to oversee the practice and procedure of the state's court system. *Bush v. State*, 428 S.W.3d 1, 16 (Tenn. 2014). Broadly speaking, the courts will consent to legislatively-promulgated rules of procedure or evidence as long as they (1) are reasonable and workable within the framework already adopted by the judiciary, and (2) work to supplement the rules already promulgated by the Tennessee Supreme Court. *State v. McCoy*, 459 S.W.3d 1, 9 (Tenn. 2014). A legislative rule "which does not frustrate or interfere with the adjudicative function of the courts does not constitute an impermissible encroachment upon the judicial branch of government." *Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 402 (Tenn. 2013) (quoting *Lynch v. City of Jellico*, 205 S.W.3d 384, 393 (Tenn. 2006)). On the other hand, the legislature may not enact rules which "strike at the very heart of a court's exercise of judicial power." *Mallard*, 40 S.W.3d at 483. "Among these inherent judicial powers are the powers to hear facts, to decide the issues of fact made by the pleadings, and to decide the questions of law involved." *Id.*

A legislative rule that would remove the court's discretion in making determinations of legal or logical relevancy would violate the principle of separation of powers and would be void. *Id.* On the other hand, the Tennessee Supreme Court has found that a rule that merely limits the application of prior procedural rules may stand. *Mansell*, 417 S.W.3d at 404-05 (concluding that statute which places limitations on the ability of the court to determine the admissibility of expert testimony was permissible in the context of Workers' Compensation Law, which the Court noted was a legislative creation); *Martin v. Lear Corp.*, 90 S.W.3d 626, 631-32 (Tenn. 2002) (upholding a workers' compensation statute allowing admission of certain expert testimony because it did not impermissibly conflict with the general procedural rule but merely limited its application); *McCoy*, 459 S.W.3d at 9-10 (holding that a legislative rule permitting certain previously inadmissible hearsay evidence did not "frustrate or interfere with the adjudicative function of Tennessee Courts"). The Tennessee Supreme Court has particularly considered whether the legislative rule impermissibly limited the judiciary's discretionary decisions. *Id.* at 10 (noting that the statute "affords trial courts considerable discretion in the determination of whether a video-recorded statement may be admitted as evidence"); *Odom*, 137 S.W.3d at 603-04 (holding that statute allowing victim impact evidence in sentencing only supplemented the Rules of Evidence because it did not indicate what weight should be given to the evidence or what sentence should be imposed despite the fact that "the word 'shall' is generally mandatory").

As the State notes, the Tennessee Attorney General's office has addressed the constitutionality of the statute. The Attorney General opined that the statute was constitutional because it did not authorize the admission of evidence which was otherwise inadmissible or was seized in violation of the Constitutions of the United States or Tennessee and that the statute did not violate the principle of separation of powers. Tenn. Op. Atty. Gen. No. 11-32, at *2 (Apr. 11, 2011). The Attorney General elaborated that the statute allowed the admission of evidence seized despite a technical or good faith violation of Tennessee Code Annotated section 40-6-101, et seq., and Tennessee Rule of Criminal Procedure 41, but that such evidence might still be excluded if the court determined that the search was unreasonable. *Id.* The opinion concluded that the statute did not infringe on inherent judicial powers. *Id.*

We conclude that the statute in question is (1) reasonable and workable within the framework already adopted by the judiciary, and (2) works to supplement the rules already promulgated by the Supreme Court. *See McCoy*, 459 S.W.3d at 9. The statute does not "strike at the very heart of a court's exercise of judicial power," including "the powers to hear facts, to decide the issues of fact made by the pleadings, and to decide the questions of law involved." *See Mallard*, 40 S.W.3d at 483. The statute by its terms only applies to evidence "otherwise admissible in a criminal proceeding and not in violation of the constitution of the United States or Tennessee." T.C.A. § 40-6-108(a). Furthermore, it leaves to the trial court's determination whether the error is "a good faith mistake or technical violation." *Id.* The trial court still has the duty to exclude evidence which was seized pursuant to an unreasonable warrantless search. The trial court would further have the duty to exclude evidence seized pursuant to a warrant issued after the seizure. Accordingly, we conclude that the statute is not unconstitutional and that the evidence admitted pursuant to the Exclusionary Rule Reform Act was not admitted in error.

We further note that the evidence which would have been suppressed as a result of any failure in the warrant was for the most part physical evidence that was merely cumulative of other evidence establishing that the defendant gave birth, experienced heavy blood loss, and cleaned the bathroom to conceal the births from her family. Accordingly, we conclude that "even if the trial court had erred in denying the Defendant's motion to suppress the evidence seized pursuant to the search warrant, the error would have been harmless beyond a reasonable doubt." *State v. John Henry Pruitt*, No. M2013-02393-CCA-R3-CD, 2015 WL 5032016, at *12 (Tenn. Crim. App. Aug. 26, 2015) (concluding that the "evidence in this case is overwhelmingly sufficient to support the Defendant's convictions irrespective of the bullets seized from the Defendant's home pursuant to the search warrant").

**IX. Admissibility of Dr. Kenner's Testimony Regarding the Defendant's Statement**

The defendant also contends she was denied her right to present a defense when the trial court excluded Dr. Kenner's testimony regarding the circumstances of her confession. The State responds that this argument is waived because the defendant failed to give proper notice of the testimony under Tennessee Rule of Criminal Procedure 12.2(b)(1) and that the trial court did not abuse its discretion in excluding the evidence. The trial court chose not to let Dr. Kenner testify generally regarding interrogation techniques, including the coercive atmosphere of the interrogation, and it chose to exclude testimony regarding the defendant's particular personal vulnerability to coercion.

Under Tennessee Rule of Criminal Procedure 12.2(b)(1), a defendant "who intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing on the issue of his or her guilt shall so notify the district attorney general in writing and file a copy of the notice with the clerk." Tenn. R. Crim. P. 12.2(b)(1). The notice is necessary because "lack of notice about the defendant's mental state may seriously disadvantage the district attorney general in preparing possible rebuttal proof." Tenn. R. Crim. P. 12.2(b), *Advisory Comm'n Cmt*. If the defendant does not give the requisite notice, "the court may exclude the testimony of any expert witness offered by the defendant on the issue of the defendant's mental condition." Tenn. R. Crim. P. 12.2(d).

Defense counsel contend that notice was adequate because the defendant gave notice that Dr. Kenner would testify and because Dr. Kenner's report, which was provided to the prosecution, included the conclusion that the "law enforcement interrogation by Detective Malach took place proximal to delivery during a time of increased vulnerability, both physical and emotional. Because of [the defendant's] dissociative symptoms and her medical condition, she was particularly vulnerable to suggestion, manipulation, and subversion of her reality." In the offer of proof, Dr. Kenner stated that this conclusion was within a reasonable degree of medical certainty. Dr. Kenner also testified in the offer of proof that Detective Malach was forcing the defendant into his narrative, cutting her off when she tried to tell what happened, and assuming that she had done something to cause the children's deaths.

After the State's objection to the testimony at trial, the defendant argued that the Rule did not require notice about the specific nature of the testimony, so long as the expert's testimony fell within the parameters of the report provided to the prosecution. The trial court excluded the testimony and the report concluding the defendant was vulnerable to suggestion but allowed testimony on the defendant's mental state at the time of the crimes and a report related to that issue.

55

Rule 12.2(d) allows the trial court to "exclude the testimony of any expert witness offered by the defendant on the issue of the defendant's mental condition" if the defendant fails to give notice under Rule 12.2(b). However, evidence should not be excluded unless "it is shown that a party is actually prejudiced by the failure to comply with the discovery order and that the prejudice cannot be otherwise eradicated." *State v. Gerald Leander Henry*, No. 01C01-9505-CR-00161, 1999 WL 92939, at \*24 (Tenn. Crim. App. Feb. 25, 1999) (quoting *State v. Garland,* 617 S.W.2d 176, 185-86 (Tenn. Crim. App. 1981)). The Rule is modeled on Federal Rule of Criminal Procedure 12.2. The Advisory Committee Note to the Federal Rule states that "[t]he rule assumes that the sanction of exclusion will result only where there has been a complete failure to disclose the report," and that an untimely disclosure of the report may warrant other relief. Fed. R. Crim. P. 12.2, Advisory Committee Notes to 2005 Amendments.

In *State v. Henry*, this court concluded that the trial court abused its discretion in excluding the expert testimony based on lack of notice under Rule 12.2(b) because the trial court made no inquiry into what prejudice would result to the State. *Henry*, 1999 WL 92939, at \*25 (concluding that the error was harmless); *compare State v. Lesergio Duran Wilson*, No. M2014-01487-CCA-R9-CD, 2015 WL 5170970, at \*12 (Tenn. Crim. App. Sept. 2, 2015) (the trial court declined to address issue of admissibility of expert testimony on voluntary intoxication when the defendant gave notice of expert's testimony regarding diminished capacity but did not give notice of expert's opinion on intoxication and the State's motion to exclude also did not address the issue). Likewise, in *State v. Thompson*, this court concluded that the evidence should have been admitted because, although the defendant did not provide notice under the Rule, the State had actual notice that the expert had been retained, the State had procured its own expert, the defense decided to present the testimony in response on other evidence which had come in at trial, and the truth-finding function of trial was not at risk. *State v. Ricky Thompson*, No. 03C01-9406-CR-00198, 1996 WL 30252, at \*9 (Tenn. Crim. App. Jan. 24, 1996).

In this case, the defendant gave notice that Dr. Kenner would testify as an expert and provided the State with Dr. Kenner's report, which stated that the defendant was particularly vulnerable, due to her physical and mental condition, to coercion during police interrogation. The State heard Dr. Kenner testify on the subject at the motion to suppress, and the State had the defendant evaluated by its own mental health expert. We conclude that the notice regarding testimony that the defendant was particularly vulnerable to suggestion was adequate. Moreover, the trial court did not exclude the evidence based on lack of notice, and the judge made no finding regarding any prejudice suffered by the State. Accordingly, we do not deny relief based on the notice requirement in Rule 12.2(b).

We note that the defendant never gave any indication that Dr. Kenner, who was the defendant's treating psychiatrist, would testify on the subject of false confessions or use of the Reid technique.[3] The subject was not in any of his reports, and the trial court noted that the subject was first being raised during the fourth day of trial and that there was no notice regarding "this particular narrow issue." The State had a mental health expert who had examined the defendant, but it argued that it had had no opportunity to procure rebuttal proof on the subject of interrogation techniques or false confessions. Dr. Kenner's curriculum vitae is not part of the record. We note that the testimony at issue does not fall under the discovery provisions of Rule 12.2(b) because it is not related to the defendant's mental condition, but it may be subject to other rules governing discovery. *See State v. Reid*, 91 S.W.3d 247, 293-94 (Tenn. 2002) (appendix) (noting that the defendant, who objected to lack of notice regarding expert testimony on blood spatter, alleged no prejudice); *State v. Carl H. Dougherty*, No. C.C.A. 827, 1989 WL 1142, at *3 (Tenn. Crim. App. Jan. 9, 1989). While it appears that the defendant did not give notice that its expert would be testifying regarding false confessions, the trial court excluded the evidence based on other grounds.

Dr. Kenner testified about his work as a psychiatrist, including his appointment as clinical faculty at Vanderbilt University Medical School and his private practice in forensic psychiatry, and he was declared an expert in that field. He testified that he was involved in end-of-life medical ethics, had worked with the FBI regarding school shooters, and that he had expertise in interrogation techniques. He testified that he interviewed the defendant for over thirteen hours, interviewed her parents, reviewed the interrogation, reviewed Dr. Auble's reports, reviewed the defendant's medical and prison records, reviewed the defendant's recorded calls from jail, and reviewed text messages and photographs introduced by the State.

During the offer of proof, Dr. Kenner testified that he had lectured on the subject of interrogation techniques and false confessions at local, national, and international meetings in the area of psychiatry. He had also been referenced in a book regarding the troops returning from Iraq. He listed no publications in the field. Dr. Kenner's proffered testimony primarily focused on going through the defendant's statement and noting places where he felt that Detective Malach was cutting her off and forcing her into his narrative. He stated that the defendant's statement to Detective Malach was "highly inaccurate" because she "bought his narrative" due to her mental diseases and defects. Dr. Kenner testified that he had given expert testimony regarding the reliability of confessions before. On cross-examination, he stated that he was "critiquing [Detective Malach's] thinking." He testified that he believed law enforcement officers stereotyped

---

[3] Defense counsel stated during the offer of proof that Dr. Kenner would speak to use of the Reid technique, an interrogation technique which may frequently be coercive.

cases such as the defendant's and that they typically believed that the baby was smothered. The trial court found that, although Dr. Kenner was a credible witness on the issue of diminished capacity, his testimony on the subject of the defendant's statement to police was "a matter of performance" and that the proffered testimony was "personal rather than professional."[4] The trial court concluded that the testimony was not reliable or credible regarding the issue, that Dr. Kenner appeared biased, and that his testimony would not substantially assist the jury. The court noted that "under his standards" no person who was emotionally involved in a traumatic event could ever be questioned by police, and it concluded that he was "not qualified" to give the testimony regarding the reliability of the confession.

Generally, the trial court is entrusted with the discretion to decide questions regarding the admissibility, qualifications, relevancy, and competency of expert testimony. *State v. Farner*, 66 S.W.3d 188, 207 (Tenn. 2001). The appellate court will find an abuse of discretion when the trial court has applied an incorrect legal standard, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that caused an injustice to the party complaining. *State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2009). The weight to be given to expert evidence, however, is a question for the jury. *Farner*, 66 S.W.3d at 208.

An expert qualified by knowledge, skill, experience, training, or education may give testimony in the form of an opinion if the expert's scientific, technical, or specialized knowledge "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702. The expert may rely on facts or data which are not admissible, so long as they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Tenn. R. Evid. 703. The trial court, however, "shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703. The reliability of expert testimony may be evaluated using the following factors:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as

---

[4] This finding was made partially in reference to Dr. Kenner's reaction during the offer of proof to the prosecutor reading aloud a portion of Dr. Kenner's prior testimony. The prosecutor read Dr. Kenner's testimony that the defendant was cognitively but not emotional capable of waiving her rights, and his response was, "Yes. I like that." The court also referenced Dr. Kenner's comparison of Detective Malach and Barney Fife.

formerly required by *Frye,* the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*State v. Ferrell*, 277 S.W.3d 372, 378 (Tenn. 2009) (quoting *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257, 265 (Tenn. 1997)). Generally, the Rules require a determination of the scientific validity and reliability of the evidence. *McDaniel*, 955 S.W.2d at 265. However, the trial court must focus on the science and not on "merely the qualifications, demeanor or conclusions of experts." *Id.* Likewise, nonscientific, specialized knowledge must be relevant and reliable, as measured by any of the *McDaniel* factors that are applicable, by the expert's qualifications, and by the straightforward connection between the expert's knowledge and the basis for the opinion. *State v. Stevens*, 78 S.W.3d 817, 834-35 (Tenn. 2002).

In deciding whether expert testimony is admissible, the trial court must first determine if the witness is qualified by knowledge, skill, experience, training, or education to give an informed opinion on the subject at issue. *Stevens*, 78 S.W.3d at 834. Next, the trial court must ensure that the basis of the opinion is trustworthy. *Id.* The court should ensure there is no "analytical gap" between the data and the opinion. *Id.* at 835. In evaluating reliability, the court looks at four components: "(1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability." *State v. Scott*, 275 S.W.3d 395, 402 (Tenn. 2009). The foundational reliability of the evidence has two aspects: the reliability of the field itself and the trustworthiness of the underlying data. *Id.* at 407. Self-reported facts in the context of a psychological evaluation are fodder for cross-examination but not a basis for excluding expert testimony. *Id.* at 409-10. When the expert's opinions "are based on relevant scientific methods, processes, and data, and not upon mere speculation, the trial court should admit the evidence." *Farner*, 66 S.W.3d at 208. However, "[j]ust because an expert is speaking does not make what he or she is saying sufficiently reliable to be admitted into evidence as expert testimony." *Scott*, 275 S.W.3d at 402.

The requirement that the trial court evaluate the trustworthiness of the facts underlying the expert's opinion "'is obviously designed to encourage trial courts to take a more active role in evaluating the reasonableness of the expert's reliance upon the particular basis for his or her testimony.'" *McDaniel*, 955 S.W.2d at 265 (quoting R. Banks, *Some Comparisons Between the New Tennessee Rules of Evidence and the Federal Rules of Evidence, Part II,* 20 Mem. S.U.L. Rev. 499, 559 (1990)). The trial court must perform a "gatekeeping" function by determining that the evidence is reliable and relevant. *Stevens*, 78 S.W.3d at 832. This function is "critical" but "not unconstrained." *Scott*, 275 S.W.3d at 404. In this case, the trial court's decision to

exclude the evidence was apparently based on its evaluation of Dr. Kenner's qualifications and credibility in that field.

The State at trial also argued that the evidence should be excluded because it did not meet the requirements of *State v. Hall*, in that it did not address diminished capacity. *See State v. Hall*, 958 S.W.2d 679, 688 (Tenn. 1997). However, there is a "longstanding rule in Tennessee that once a confession is admitted into evidence, a jury may hear evidence concerning the circumstances under which the confession was procured in order to determine whether the defendant made the confession and whether it is true." *State v. Burns*, 29 S.W.3d 40, 48 (Tenn. Crim. App. 1999). "[T]he physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt[] or innocence." *State v. John Henry Wallen*, No. 03C01-9304-CR-00136, 1995 WL 702611, at *23 (Tenn. Crim. App. Nov. 30, 1995) (quoting *Crane v. Kentucky,* 476 U.S. 683, 689 (1986)). In general, the circumstances of a confession are relevant "to demonstrate the coercive atmosphere surrounding the defendant's … statement; to allow the jury to assess the reliability and credibility of the confession …; and to explain or qualify the confession." *State v. Torres*, 82 S.W.3d 236, 251-52 (Tenn. 2002).

While "'[t]he right to present witnesses is of critical importance ... it is not absolute. In appropriate cases, the right must yield to other legitimate interests in the criminal trial process.'" *State v. Marquest Mays*, No. W2012-00607-CCA-R3-CD, 2014 WL 902478, at *23 (Tenn. Crim. App. Mar. 7, 2014), (quoting *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000)). Likewise, evidence offered on the circumstances surrounding a confession may not be admissible if it "does not comply with evidentiary rules that serve the interests of fairness and reliability." *Wallen*, 1995 WL 702611, at *24.

When expert testimony complies with the Rules of Evidence, Tennessee courts have permitted testimony regarding the defendant's vulnerability to coercion, so long as the testimony did not infringe on the jury's determination regarding the truth of the confession. In *State v. Wallen*, the trial court excluded the testimony of the defendant's expert regarding the reliability of his confession. *Wallen*, 1995 WL 702611, at *22. On appeal, this court, reversing on other grounds, concluded that there was no legal basis for excluding the evidence. *Id.* at *27. The appellate opinion noted that the testimony would substantially assist the trier of fact in determining the truth of the confession and that it was properly the subject of expert testimony. *Id.* at *25. The court stated that, while expert testimony which invades the province of the jury by deciding the weight to be given a confession or by commenting on the credibility of the witness is not admissible, the expert's testimony did not do so because it was related to the environment of the interrogation and the appellant's ability to read, write, and understand the waiver and

interrogation.  *Id.* at \*25 (citing  *State v. Schimpf*, 782 S.W.2d 186, 192 (Tenn. Crim. App. 1989)).  The court further noted that the testimony was based on trustworthy facts generally relied upon by experts in the field.  *Id.* at \*25.

In *State v. Ted Ormand Pate*, the trial court found that the data underlying the expert's opinion that the defendant was easily coerced were reliable and allowed the expert to testify regarding the defendant's mental condition but excluded testimony regarding whether the defendant personally had a propensity to make false statements. *State v. Ted Ormand Pate*, No. M2009-02321-CCA-R3-CD, 2011 WL 6935329, at \*11 (Tenn. Crim. App. Nov. 22, 2011).  This court determined that expert testimony bearing on the defendant's response to interrogation may be admissible if it falls outside the knowledge of the jury and does not comment on the truth of the particular confession.  *Id.* at \*12.  The trial court's decision was affirmed because the expert was permitted to testify regarding the defendant's compliant personality but not the credibility of his statement.  *Id.*

However, courts have readily excluded expert testimony regarding a confession when the qualifications of the expert or of the underlying facts were placed in doubt.  In *State v. Mays*, this court acknowledged that the defendant's attack on his confession was critical but denied relief because, despite the doctor's statements that he would have testified to the issue of whether the defendant's confession were true, there was nothing in the record regarding how the defendant scored on compliance and suggestibility tests, and because the mental evaluation was completed during trial, prejudicing the State's ability to rebut the testimony.  *Mays*, 2014 WL 902478, at \*22-23 (noting also that the expert was permitted to testify regarding false confessions and the techniques used in the defendant's interview).  Likewise, in *State v. Brimmer*, the defendant's expert would have testified that the defendant was an individual who could have been easily coerced.  *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994).  The Tennessee Supreme Court upheld the trial court's exclusion of the evidence based on the fact that the basis of the doctor's opinion was not trustworthy because the doctor had not reviewed the entire interrogation. *Id.*

In a separate issue raised in *State v. Pate*, the trial court excluded testimony regarding the accuracy of the victim's statements in her forensic interview.  *Pate*, 2011 WL 6935329, at \*11-13.  This court affirmed, concluding that the trial court's determination that the expert was not qualified in this field was not illogical when the expert was only able to list a few conferences in which he spoke and a few others in which the topic was addressed.  *Id.* at \*13-14.  Likewise, the court in *State v. Ackerman* affirmed the exclusion of the expert's testimony regarding child forensic interviews because the expert's knowledge was limited to some decade-old presentations and included no publications. *State v. Ackerman*, 397 S.W.3d 617, 633 (Tenn. Crim. App.

2012) (also concluding that the trial court did not err in excluding expert's testimony, which would have stated that the defendant was vulnerable to suggestion but would not have commented on whether the defendant was more or less likely than any other person to provide inaccurate information, because the testimony was only marginally relevant) *overruled on other grounds by State v. Sanders*, 452 S.W.3d 300 (Tenn. 2014).

Although the trial court did not make separate findings in excluding Dr. Kenner's testimony about false confessions in general and about the defendant's tendency to suggestion in particular, it excluded testimony regarding both, finding the testimony was not credible, reliable, or likely to assist the jury.

In contrast to the expert testimony presented in *Pate*, Dr. Kenner did not, during the offer of proof, cite to any tests to measure the defendant's submissive, easily-coerced personality. Although he looked at the results of the tests Dr. Auble had administered and concluded that the defendant was answering honestly, he did not testify regarding how the defendant performed on tests compared to an average person to show that she was particularly submissive. *See Pate*, 2011 WL 6935329, at \*7-8 (defendant's expert testified that the MMPI-2 showed that the defendant was anxious, naïve, and in the ninety-ninth percentile on the submissiveness scale). Instead, Dr. Kenner's testimony appeared to base his conclusions on the observation that the defendant, during his sessions with her, would "fill in blanks rather than presenting her own memories of events." He testified, both in the offer of proof and in front of the jury, that the defendant was very passive. During the offer of proof, he also testified that Detective Malach frequently cut the defendant off or redirected her into his narrative and that his interrogation was "bullying." Dr. Kenner stated he had spoken at a few conferences on the subject of false confessions, but he did not list any publications in the field. *See id.* at \*13-14 (holding that trial court did not abuse its discretion in concluding that the expert was not qualified in the field when the only evidence of expertise was speaking at a few conferences).

The trial court concluded that Dr. Kenner's testimony regarding this subject was not reliable. While a witness may be qualified as an expert even absent publications or reliance on scientific testing, we conclude that the trial court did not abuse its discretion in excluding Dr. Kenner's testimony based on the qualifications presented during the offer of proof. The trial court also concluded that the testimony would not substantially assist the trier of fact, presumably because the proffered testimony was primarily a line-by-line analysis of the credibility of the interview. Dr. Kenner testified that Detective Malach forced the defendant to agree with his narrative, but the court concluded that the jury could itself observe the defendant's interactions with Detective Malach and determine to what extent she was merely agreeing with his narrative. *See Schimpf*, 782 S.W.2d at 193-94 (concluding that testimony invaded the province of the jury by

deciding witness credibility) *superseded by statute as stated in State v. Collier*, 411 S.W.3d 886, 896 (Tenn. 2013).

We agree with the defendant that expert testimony regarding the circumstances of an interrogation is generally admissible and that the testimony in this case would have been helpful to the defense. Nevertheless, we cannot say that the trial court abused its discretion in concluding that the expert testimony in this case was not sufficiently reliable to be presented to the jury. *Id.* at \*13-14. The trial court found that Dr. Kenner could provide expertise in forensic psychiatry but that his expertise did not extend to false confessions because his testimony in that area was not reliable. We cannot conclude, given the proffered testimony dissecting the interview and the qualifications listed during the offer of proof, that the trial court applied an incorrect legal standard, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that caused an injustice to the party complaining. *Scott*, 275 S.W.3d at 404. Accordingly, the defendant is not entitled to relief.

## X. Admissibility of Text Messages

The defendant objects to the admission of the text messages sent between the defendant and Mr. Smith on the basis that the State's expert failed to establish the reliability of the time that the messages were sent or received and that his testimony was therefore in violation of Tennessee Rule of Evidence 703. The State counters that the argument is waived because the defendant did not object or argue that the testimony violated Rule 703 during trial.

The defendant objected prior to trial to the admission of certain text messages based on the timeliness of the discovery, and the trial court ruled in favor of the State. The defendant moved to reconsider the exclusion of the texts based on the contention that they were not discovered pursuant to a specific warrant but as part of what was essentially a data dump. Prior to Agent Garnett's testimony at trial, the defense renewed its objection to the text messages and referenced the trial court's pretrial ruling. During Agent Garnett's testimony, defense counsel questioned Agent Garnett regarding the accuracy of the times in the text messages. Agent Garnett testified that the times in his report indicated the times recorded by the individual device and that these times might be inaccurate if the device was not recording correctly.[5] After Agent Garnett's testimony,

---

[5] A comparison of the content and time-stamp of messages sent between the defendant's telephone and Mr. Smith's telephone, along with Agent Garnett's testimony that most devices would record in Greenwich mean time, leads to the inference that one of Mr. Smith's devices recorded "a.m." and "p.m." incorrectly.

63

defense counsel objected to the text messages, stating that the inaccuracy of the time-stamps had not been the subject of the previous motion to suppress because he had been unaware of the issue. The trial court ruled that the issue of the accuracy of the times went to the weight and not the admissibility of the evidence. Although the defendant challenged the admission of the text messages based on the possibly inaccurate times, the defendant never cited Tennessee Rule of Evidence 703, and we conclude that the State is correct that the defendant did not question the reliability of the expert testimony regarding the messages pursuant to that Rule.

Reviewing for plain error, we conclude that the defendant is not entitled to relief. For an error to constitute plain error sufficient to merit relief, the following factors must be present: a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is necessary to do substantial justice. *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). Additionally, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (quoting *Adkisson,* 899 S.W.2d at 642). A court need not consider all the factors if it is clear that the defendant will fail to establish at least one. *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010). An appellate court's *sua sponte* invocation of plain error relief should be exercised sparingly "because 'appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbitrators of legal questions presented and argued by the parties before them.'" *Bishop*, 431 S.W.3d at 44 (quoting *State v. Northern,* 262 S.W.3d 741, 766 (Tenn. 2008) (Holder, J., concurring and dissenting)).

The defendant claims that the trial court should not have allowed the expert testimony because "the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703. She argues that Agent Garnett "could not base his opinion upon the time marks assigned to each text message." Agent Garnett's testimony, however, was not based on the times indicated in his report. His testimony was simply that he used certain tools to extract data in the form of text messages from the defendant's telephone and from two telephones belonging to Mr. Smith. He did not give any opinion based on the time-stamps, which he acknowledged reflected the times recorded by the devices and which he acknowledged were not necessarily accurate. His testimony was that the data was an accurate reflection of what was recorded on each device at the time that he used the extractor tool. Accordingly, no clear and unequivocal rule of law was breached. Moreover, the reliability of the outcome of the trial is not implicated in the accuracy of the time-stamp on the text messages. The messages which appeared to have an incorrect time-stamp were sent months before the crimes, and the timing of these messages in no way implicates any of the issues in dispute at trial. The substantial accuracy of the time-

stamps of the text messages sent from the defendant's telephone around the time the twins were born was attested to by witnesses such as the defendant's father and sister. Furthermore, the timing of the births was never in dispute at trial. We conclude that the defendant is not entitled to relief.


## XI. Admissibility of Telephone Google Searches

The defendant contends that the trial court erred in allowing certain Google searches performed on the defendant's telephone to be used in cross-examining Dr. Kenner and in denying a mistrial on this basis. The defendant also objects that the searches were put before the jury but never properly authenticated and argues that this lack of authentication made them inadmissible and irrelevant.

After Dr. Kenner testified that the defendant did not know that she was pregnant, the prosecutor asked him if he was aware that a search had been performed on her telephone on September 3, 2011, for "pregnancy calculator" and that another had been performed on September 5, 2011, for "pregnant and doctor porn." The defense objected based on the fact that the trial court had previously ruled that the evidence could only come in for rebuttal and based on the contention that their evidentiary value was substantially outweighed by danger of unfair prejudice under Tennessee Rule of Evidence 403. The trial court ruled that the defense had opened the door to the questions because Dr. Kenner's awareness of the searches bore on the issue of the credibility of his diagnosis that the defendant suffered from pregnancy denial, and the court found that the evidence was relevant and reliable, having been authenticated in a previous hearing. A list of Google searches performed in September on the defendant's phone, marked to show several searches related to pregnancy that the State intended to put before the jury, was made an exhibit for identification only until Agent Garnett could authenticate it. The trial court agreed with the defense that the searches on the list which did not reference pregnancy would be prejudicial and not relevant. The prosecution then questioned Dr. Kenner about four more Google searches involving pregnancy and inducing labor.

The defendant's objection to the searches appears to be based on an assertion that the State had agreed not to use the Google searches during its case-in-chief and that "the manner in which the government introduced the matter to the jury by questioning Dr. Kenner about these searches was entirely prejudicial."[6]

---

[6] The defendant does not argue that the trial court erred in weighing the probative value of the evidence against any potential prejudice related to the fact that three of the searches involved the word "porn" or "sex." *See State v. Clark*, 452 S.W.3d 268, 289 (Tenn. 2014) (noting that "[w]hile using adult pornography is not a 'crime,' many people consider it a moral

A trial court's decisions regarding the admissibility of evidence are generally reviewed for abuse of discretion. *State v. Parker*, 350 S.W.3d 883, 896-97 (Tenn. 2011). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015).

In general, a witness may be cross-examined on any matter relevant to any issue in the case, including credibility. Tenn. R. Evid. 611(b). "The propriety, scope, manner and control of cross-examination of witnesses lies within the discretion of the trial court." *State v. Reid*, 213 S.W.3d 792, 839 (Tenn. 2006). The trial court's determinations regarding cross-examination will not be reversed absent abuse of that discretion. *State v. Zirkle*, 910 S.W.2d 874, 890 (Tenn. Crim. App. 1995). Moreover, "[o]nce [expert] evidence has been admitted, the defense is given broad latitude to test the validity of the expert's opinion on cross examination." *State v. Farner*, 66 S.W.3d 188, 208 (Tenn. 2001). "[O]n cross-examination, the expert may be required to disclose … underlying facts or data" in order to impeach the expert's diagnosis. *State v. Thacker*, 164 S.W.3d 208, 228 (Tenn. 2005); *see also* Tenn. R. Evid. 705 ("The expert may in any event be required to disclose the underlying facts or data on cross-examination.").

The trial court ruled that the Google searches would be admissible because the defendant's expert witness had "opened the door" to the evidence through his testimony that the defendant did not know she was pregnant. Evidence which is inadmissible can become admissible when a party opens the door by raising the subject of that evidence at trial. *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012). "When a party raises a subject at trial, the party 'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." *Id.* (quoting 21 Charles Alan Wright et al., *Federal Practice & Procedure Evidence* § 5039.1). Permitting such evidence is an equitable principle "that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." *Id.*

Here, Dr. Kenner testified that he believed that the defendant suffered from pregnancy denial, that she was unaware that she was pregnant, and that fifty to sixty percent of his evaluation was based on the defendant's statements to him. The trial court allowed the State to test the credibility of Dr. Kenner's diagnosis by asking him if, in making the diagnosis, he was aware that the defendant had performed several Google

'wrong,'" and that it should be analyzed under Tennessee Rule of Evidence 404(b)). Accordingly, we address only her argument that the State erred in the manner in which it introduced the evidence – through the cross-examination of Dr. Kenner.

searches involving terms such as "pregnancy" and "labor" in September, prior to the birth of the twins. The State also asked Dr. Kenner if he was aware that the defendant had told Detective Malach and Dr. Auble that she knew she was pregnant. We conclude that the defendant's evidence that she was unaware of the pregnancy opened the door to the admission of evidence that she was in fact aware of the pregnancy, and we hold that the State's questions were a permissible inquiry into the data used by Dr. Kenner in reaching his diagnosis. Accordingly, permitting the introduction of Google searches through the medium of cross-examination was not error.

Because the defendant has not shown that the trial court abused its discretion in permitting the cross-examination of Dr. Kenner about the searches, we conclude that the denial of a mistrial was likewise not in error.

The defendant also claims error in the failure to authenticate the Google searches. Tennessee Rule of Evidence 901 discusses the requirement of authentication prior to admissibility. Evidence should not be admitted if its identity and integrity cannot be demonstrated by chain of custody or other appropriate means. *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000). However, the requirement that evidence be authenticated is limited to tangible evidence. *See State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (noting that a condition precedent to the introduction of tangible evidence is the witness's ability to identify it or establish a chain of custody). The list of Google searches, which was marked for identification only, was never introduced as tangible evidence. Instead, Dr. Kenner was cross-examined regarding his knowledge of the searches performed on the defendant's telephone. *See* Tenn. R. Evid. 607. Because the list was not introduced into evidence, there was no requirement that it be authenticated. *See State v. Jeremy McMillon*, No. E2010-01091-CCA-R3CD, 2011 WL 4424732, at *8 (Tenn. Crim. App. Sept. 22, 2011) ("In the case herein, the bullet at issue was never actually entered into evidence . . . . Therefore, the bullet itself is not tangible evidence. . ., and there was no need for authentication."). We conclude that there was no error in the authentication or admission of the evidence.

The defendant also objects that the relevance of the searches was conditioned on the fact that they were performed on the defendant's telephone and that the failure to call Agent Garnett in rebuttal required exclusion of the evidence under Tennessee Rule of Evidence 104(b). However, the defendant never objected to the Google searches on relevancy grounds at trial, and all parties made numerous references to a prior hearing where Agent Garnett had testified that the searches were retrieved from the defendant's telephone. *See* Tenn. R. Evid. 104(a) ("Preliminary questions concerning … the admissibility of evidence shall be determined by the court."). The searches were not introduced into evidence but merely used in impeachment. Neither did the defendant move to strike the testimony at any time. We conclude that this argument is waived.

# XII. Admissibility of Jail Calls

The defendant claims that the trial court's decision to exclude the telephone calls she placed from the jail to her family was reversible error.  She notes that the telephone calls were evidence of her emotional and mental state at the time of her interrogation and arrest.

At trial, Dr. Kenner was permitted to testify that, in the recorded conversations the defendant had with her family while in jail, she described feeling dizzy and coming close to losing consciousness.  He testified that these were classic symptoms of severe anemia after acute blood loss.  He also testified that the jail nurse noted pallor and dehydration, which was also consistent with acute blood loss, but he acknowledged that the jail nurse did not indicate that the defendant should be readmitted to the hospital.  Dr. Auble likewise testified that she reviewed the jail telephone calls as part of her diagnosis.   The defendant sought to admit the recorded conversations.  Defense counsel stated that, in the recordings, the defendant tells her family that she feels weak and dizzy and that her general demeanor during the calls is relevant to her mental condition.  The defense argued that the calls should be admissible under the hearsay exceptions in Tennessee Rules of Evidence 803(3) and 803(4). The trial court noted that the defendant's calls did not appear relevant to the defense of diminished capacity, and trial counsel countered that they were offered to show that the defendant's physical condition was consistent with delirium.  The prosecution argued that the tapes were an hour and a half long, that the bulk of the tapes were not relevant, that the tapes were inadmissible hearsay, and that the defendant's statements were self-serving.  The trial court concluded that neither hearsay exception applied and excluded the tapes.

Generally, a statement other than one made by the declarant while testifying, offered to prove the truth of the matter asserted, is inadmissible.  Tenn. R. Evid. 801, 802.  The determination of whether a statement is hearsay is a question of law.  *State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008).  Application of a hearsay exception, however, may involve factual determinations, and in these, the appellate court defers to the trial court's findings of fact.  *Id.* at 761.

Tennessee Rule of Evidence 803(4) excepts from the hearsay rule "[s]tatements made for purposes of medical diagnosis and treatment describing … past or present symptoms, pain, or sensations."  Tenn. R. Evid. 803(4).  The Advisory Commission's Comment clarifies that the Rule "continues the Tennessee position of limiting declarations of past physical condition to those made to treating doctors."  Tenn. R. Evid. 803(4) Advisory Comm'n Cmt.  The rationale of the Rule is that such a statement will be

reliable because the person making the statement has an interest in receiving appropriate medical care. *State v. Lynn*, 924 S.W.2d 892, 898 (Tenn. 1996). "Courts have reasoned that patients seeking medical assistance are strongly motivated to be truthful because accurate diagnosis and effective treatment often depend, in part, upon what patients tell health care providers." *State v. McLeod*, 937 S.W.2d 867, 870 (Tenn. 1996). The Tennessee Supreme Court has noted that the rule may apply not just to doctors but to "any person to whom a statement is made for purposes of or pertinent to medical diagnosis and treatment." *Id.* at 869 n.1 (Tenn. 1996) (citing *State v. Rucker*, 847 S.W.2d 512 (Tenn. Crim. App. 1992) (statement made to a nurse)). The Rule does not, however, apply when the statement is not made for the purpose of medical diagnosis and treatment. For instance, the Tennessee Supreme Court has held that statements made to a psychologist are inadmissible under the exception because they are not made for medical diagnosis and treatment. *State v. Barone*, 852 S.W.2d 216, 220 (Tenn. 1993). Here, the statements were made to the defendant's family and friends and were not made to a medical professional for the purpose of medical diagnosis and treatment. The trial court did not err in excluding the statements under this exception.

Tennessee Rule of Evidence 803(3) permits statements "of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) …." Tenn. R. Evid. 803(3). The Advisory Commission Comment elaborates that statements of "then existing" physical conditions "need not be made to a doctor; any witness who overheard the hearsay statement could repeat it in court under this exception." Tenn. R. Evid. 803(3) *Advisory Comm'n Cmt.* However, the statement is only "admissible to prove mental state at issue or subsequent conduct consistent with that mental state" and "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." Tenn. R. Evid. 803(3) *Advisory Comm'n Cmt*; *see State v. Ramos*, 331 S.W.3d 408, 415 (Tenn. Crim. App. 2010) (holding that child victim's statement regarding pain was admissible under the exception). This court has held that evidence under this Rule is admissible when the declarant's state of mind would be relevant. *State v. Burns*, 29 S.W.3d 40, 47 (Tenn. Crim. App. 1999).

Here, the defendant sought to introduce the statements of her postpartum physical condition as relevant to her mental state during the births, and these statements appear to fit within the hearsay exception in Rule 803(3). Nevertheless, we conclude that the trial court did not abuse its discretion in excluding the evidence. The defense sought to introduce approximately one and a half hours of recorded telephone calls, the bulk of which contained statements that were undisputedly not relevant or material. The defendant sought to introduce evidence not only consisting of statements regarding her physical health but also irrelevant statements used for the purpose of illustrating the timbre of her voice at the time. The defense never sought to cull the telephone calls to

69

limit the evidence to the statements admissible under Rule 803(3). We cannot conclude that the trial court abused its discretion in excluding the telephone calls.

Furthermore, even if the trial court's decision was error, we determine that the error was harmless. The relevant portions of the telephone calls, those that detailed the defendant's physical condition supporting the diagnoses of hypovolemic shock and delirium, were put before the jury during Dr. Kenner's testimony. The defendant is not entitled to relief.


## XIII. Admissibility of "The Vampire Diaries" Photograph

The defendant also contends that the trial court committed reversible error by allowing the prosecution to admit a photograph of her bedroom which focused on a shelf of DVDs from the television series "The Vampire Diaries." The prosecution argued that the photograph was relevant to premeditation in that it confirmed the defendant's text messages, sent after the births, in which she made plans to watch the series with a friend. The prosecution also argued that the photograph should be admitted because the "[S]tate's theory is just showing that she was going on with her life." The defense argued that the photograph had no evidentiary value and that it was potentially prejudicial because of the jury might react negatively to the subject of vampires. The trial court chose to admit the photograph, finding that it was "very relevant, key" to the defendant's *mens rea* at the time of the crime, which would be "hotly contested."

A photograph must be relevant to an issue decided by the trier of fact in order to be admissible. *State v. Adams*, 405 S.W.3d 641, 657 (Tenn. 2013). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. A photograph should be excluded, however, if its probative value is substantially outweighed by danger of unfair prejudice. Tenn. R. Evid. 403. In determining the admissibility of a photograph, the trial court should consider the questions of fact which the jury will decide and any other evidence presented during trial. *Adams*, 405 S.W.3d at 657. The decision to admit or exclude photographic evidence lies in the trial court's discretion. *State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006).

The State argues that the photograph was relevant to the defendant's *mens rea* because it corroborated a text message concerning her plans to watch the show after the deaths of her children. While the defendant's actions immediately following the deaths may reflect on her mental state, *see State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (citing destruction or secretion of evidence and calmness immediately after killing as indicative of premeditation), the same cannot be said of a picture of her bookshelf. "In

assessing probative value, the court must understand the proof and theory of the case, and whether there is a *real dispute* about the issue the evidence is to prove." *Young*, 196 S.W.3d at 106 (quoting Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, *Tennessee Law of Evidence,* § 403.[5] (5th ed.2005) (emphasis added in *Young*)). The defendant did not dispute that she sent a text message regarding her intent to watch the show. *See Young*, 196 S.W.3d at 106 ("Defendant did not attack at trial the credibility of his confession. Accordingly, the motives underlying his confession had only marginal relevance."). The picture of the defendant's bookshelf had miniscule, if any, probative value regarding the issues contested at trial. Her possession of DVD episodes of "The Vampire Diaries" does not make it more or less probable that she committed premeditated murder, felony murder, or aggravated child abuse. However, neither was the photograph particularly prejudicial. The photograph was one picture of a bookshelf introduced among close to seventy photographs of the defendant's home, including photographs of the bodies of the babies and of her bloody clothing. Accordingly, while we conclude that the photograph was admitted in error because it had no relevance to the issues in dispute in the case, we also conclude that the error was harmless. *See Young*, 196 S.W.3d at 106.

## XIV. Cumulative Error

The doctrine of cumulative error recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Reversal for cumulative error functions to protect the defendant's constitutional right to a fair trial, but such reversals are rare. *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). The doctrine of cumulative error only applies when there has been more than one error committed during trial. *Hester*, 324 S.W.3d at 77. The appellate court must assess whether the errors, each of which may be harmless in isolation, function in the aggregate to deny the defendant the right to a fair trial. *Id.* at 76. Such claims are *sui generis* and must be assessed against the background of the whole case, evaluating the nature and number of errors, their relationship with one another and combined effect, the trial court's remedial efforts, the strength of the State's case, and the length of the proceedings. *Herron*, 461 S.W.3d at 910 (citing *Hester*, 324 S.W.3d at 77). We conclude that the aggregate of any errors committed during trial were not such as to deny the defendant her right to a fair trial, and we accordingly deny relief.

**CONCLUSION**

Based on the foregoing analysis, we affirm the judgments of the trial court.


_____
JOHN EVERETT WILLIAMS, JUDGE